42166. ATLANTA FUNTOWN, INC. v. CROUCH, by Next Friend.

42167. ATLANTA FUNTOWN, INC. v. CROUCH.

ARGUED JULY 8, 1966—DECIDED NOVEMBER 29, 1966.

704

*Long, Weinberg & Ansley, Gregg Loomis,* for appellant.

*Atkins & Atkins, Alton T. Milam, Ben S. Atkins,* for appellees.

EBERHARDT, Judge. ■ The denial of a motion for summary judgment is itself an appealable judgment. *Undercofler v. Grantham Transfer Co.,* 222 Ga. 654 (151 SE2d 765).[1] And see *Kahn v. Graper,* 114 Ga. App. 572 (152 SE2d 10). In the case under review the motion for summary judgment and the oral motion to dismiss in the nature of a general demurrer were both denied in a single order entered January 20, 1966. The notice of appeal from this order was filed February 16, 1966. It thus appears that the overruling of the general demurrer and the denial of the motion for summary judgment are properly before us for review. Section 5 of the Appellate Practice Act of 1965 (Ga. L. 1965, pp. 18, 21; Ga. L. 1966, p. 493; *Code Ann.* § 6-803).

■ The precise questions raised by this appeal do not appear to have been decided in Georgia. Without attempting to formulate the specific rule in regard to the standard of care owed to its invitee-patron by the proprietor and operator of an amusement device such as that here involved (see *Code* § 105-401; *Moone v. Smith,* 6 Ga. App. 649 (2) (65 SE 712); *Carlyle v. Goettee,* 64 Ga. App. 360 (1) (13 SE2d 206), further appeal 68 Ga. App. 288 (1) (22 SE2d 854); *Macon Tel. Pub. Co. v. Graden,* 79 Ga. App. 230 (1c) (53 SE2d 371); *Rogers v. Atlanta*

---

[1]Quaere: Is this to be changed by § 56 (h) of the Civil Practice Act of 1966 (Ga. L. 1966, p. 609) when it becomes effective March 1, 1967?

*Enterprises, Inc.*, 89 Ga. App. 903, 906 (81 SE2d 721); *Land v. Amusement Vending Co.*, 94 Ga. App. 743 (96 SE2d 337, 75 ALR2d 788); *Tatum v. Clemones*, 105 Ga. App. 221 (124 SE2d 425)), we think the petition sufficiently sets forth a failure to exercise the ordinary care required by *Code* § 105-401. Since there are neither allegations of defective design, construction, or maintenance, nor allegations of unusual occurrences or physical aberrations in the operation and performance of the amusement device, it may be urged with some propriety, and particularly in view of the cases cited in Division 3 of this opinion, that the allegations in regard to the speed at which the car was operated are defective in not alleging that the speed was unusual or that the operation of the device was in any manner different from the usual and ordinary operation of this or similar devices. As a matter of pleading, however, we regard the allegations that defendant failed to control the speed of the cars and operated them at a speed that was "greater than reasonable" as tantamount to such allegations. Thus construed, the petition is not subject to the rule stated in *Hunt v. Thomasville Baseball Co.*, 80 Ga. App. 572 (56 SE2d 828), infra, *Tatum v. Clemones*, 105 Ga. App. 221 (124 SE2d 425), infra, and other cases decided on demurrer to the effect that plaintiff's actual or constructive knowledge, or means of knowing, of the conditions and dangers was equal to that of the defendant, barring recovery.

In addition, the petition is sufficient to withstand general demurrer for another reason. Even in the case of a trespasser or licensee, where the standard of care is less than in the case of an invitee (see *Crosby v. Savannah Electric &c. Co.*, 114 Ga. App. 193 (150 SE2d 563) and *Kahn v. Graper*, 114 Ga. App. 572, supra), it is a familiar principle that there is a duty to use ordinary care to avoid injuring him after his presence and danger are actually known. See, e.g., *Georgia Power Co. v. Deese*, 78 Ga. App. 704, 707-708 (51 SE2d 724); *Augusta Amusements, Inc. v. Powell*, 93 Ga. App. 752, 755 (92 SE2d 720).

While the petition here does not allege that defendant's servants had actual knowledge during the course of the ride that plaintiff was injured and thus was in a position of peril, it does allege that when she began to experience pain she called out to

the attendants to stop the cars but "was not *allowed or permitted* to get off the ride until it came to an end and stopped at the same place where she boarded the ride originally," and that "although she did cry out and scream for the attendant to stop the ride or to slow the ride down the attendants, employees and servants of the defendant failed *and refused* to do so." (Emphasis supplied). In the specifications of negligence it is charged that "the defendant failed and *refused to heed* the call of plaintiff to reduce the speed of the car on which she was riding." (Emphasis supplied). Although it is not specifically alleged that plaintiff called out that she was in pain or had been injured, we think these allegations are sufficient, as against general demurrer, to show that the servants of defendant had actual knowledge of plaintiff's peril and thus to raise the duty to exercise ordinary care for her safety, irrespective of any other duty owing and irrespective of any prior knowledge or means of knowing of danger on her part. Whether the attendants and servants in fact heard her cries in such a manner as to raise the duty, and whether the failure to stop or slow the cars constituted a breach of this duty, would ordinarily be questions for the jury. Accordingly the denial of the oral motion to dismiss in the nature of a general demurrer was not error.

■ The case takes on a different light on defendant's motion for summary judgment where plaintiff's deposition was specified as evidence. Plaintiff testified that the first time she felt as if something might be wrong with her was *after she got off* the ride. In regard to her calls to stop or slow, she testified that she screamed because the ride frightened her and that everyone else was screaming and squealing as they do on that kind of ride. When asked if she screamed and squealed like all the other people on the ride, she replied: "Well, I guess I did." When asked if she said anything or if she just squealed, she replied: "Oh, I screamed for them to stop and slow the thing down and so did my date." When asked if she thought the attendants even heard her with all the other screaming and squealing from the other patrons of the ride, she replied: "I doubt it. I doubt it."

Thus plaintiff has established that she screamed, not for the

purpose of giving notice of an injury of which she was not even aware, but in company with her date and everyone else on the ride because of the thrill and exhilaration produced by that type of amusement. In addition she doubted that the attendants even heard her. By her own testimony, then, plaintiff has entitled defendant to judgment as a matter of law on this feature of the case since she has "pierced the allegations" of her own pleading and shown that there is no genuine issue as to the facts which would establish actual knowledge by defendant of her injury and consequent position of peril.

Was defendant otherwise entitled to summary judgment? "The sole question for determination" as propounded in defendant's behalf "is whether a person may recover for injuries sustained while riding on an amusement device where there is no allegation nor showing that the device was in any manner defective, but instead was operated in the same manner as it had been observed by the plaintiff before she chose to ride thereupon."

It is thus contended that the doctrine of assumption of risk is applicable to the facts of this case and bars a recovery. We do not find any cases in our own courts touching upon this doctrine specifically in regard to a patron of the owner or operator of an amusement device such as the "Wild Mouse." We can think of no class of cases, however, where the application of the doctrine is more appropriate than in the case of thrill-seeking patrons of amusement devices *if* the facts of the cases demand an application of the doctrine.

We stated in *Rogers v. Atlanta Enterprises,* 89 Ga. App. 903, 907 (81 SE2d 721): "It might be added that a decision holding that the assumption-of-risk doctrine is not applicable as against an invitee in a place of amusement, the facts being equally known to both parties, would not only be contrary to the trend of authority, but would result in grave injustice to the proprietor." That case dealt with a patron who was injured in a theater by slipping on a popcorn box. It appeared that while neither the patron nor the defendant had actual knowledge of the location of the particular box on which the patron tripped, both parties had equal means of knowing that popcorn boxes

were likely to be on the floor and that the floor would be unilluminated. We held there that "[a]n invitee who is as fully aware of the dangers and defects of the premises of the proprietor as is the proprietor himself, in coming on such premises assumes the risks thereon, and cannot recover from the defendant for injuries resulting by reason of such dangers and defects." As stated in the body of the opinion, "[b]y entering the theater under the circumstances here, she voluntarily assumed the risk that other patrons might negligently throw such cartons to the floor, and that they often did so, and, knowing that the management would not and did not attempt to clean them up during the progress of the entertainment, she assumed the risk of finding one of them in her path. Her means of knowledge being equal with that of the defendant, it follows that she has failed to show a right of recovery based upon the acts of negligence alleged." We stated further that "[t]he duty of ordinary care that a patron [sic] owes to his invitees is the same duty of ordinary care in keeping the premises safe which a master owes to his servant. [Citations omitted]. In either case, two elements must exist in order to merit recovery—fault on the part of the owner, and ignorance of the danger on the part of the invitee. [Citations omitted]. As stated in *Hunt v. Thomasville Baseball Co.*, 80 Ga. App. 572, 573 (56 SE2d 828): 'The rules governing the land proprietor's duty to his invitee presuppose that the possessor knows of the condition and "has no reason to believe that they (his invitees) will discover the condition or realize the risk involved therein." 2 Restatement, Law of Torts, § 343.'"

In *Hunt v. Thomasville Baseball Co.*, 80 Ga. App. 572, supra, we held: "Where a person wishing to witness a professional baseball game purchases a ticket and chooses or accepts a seat in a portion of the grandstand which is unprotected, he voluntarily assumes the risk inherent in such a position, he being presumed to know there is a likelihood of wild balls being thrown or batted into the grandstand thus unprotected. Where during the warm-up preliminary to playing such a professional baseball game a wild ball is thrown into that portion of the grandstand occupied by such spectator and he is injured, he can-

not recover." We quoted from Hudson v. Kansas City Baseball Club, 349 Mo. 1215, 1225 (164 SW2d 318) as follows: "The basis of the proprietor's liability is his superior knowledge and if his invitee knows of the condition or hazard there is no duty on the part of the proprietor to warn him and there is no liability for resulting injury because the invitee has as much knowledge as the proprietor does and then by voluntarily acting, in view of his knowledge, assumes the risks and dangers incident to the known condition."

This language was also quoted in *Rogers v. Atlanta Enterprises*, 89 Ga. App. 903, supra, and was made the express holding in *Tatum v. Clemones*, 105 Ga. App. 221, supra. In the latter case an invitee-spectator was struck by a "Go-Kart" at defendant's race track. It appeared that there were two race tracks, one encircling the other, and that the "Go-Kart" which struck the spectator had been on the inner track while the spectator was on the unprotected outer track under a "pit-pass." We affirmed the sustaining of a general demurrer, holding that the spectator, by voluntarily seeking and obtaining permission to go onto the outside track, a place not designated for spectators, with a knowledge of the dangers inherent to one occupying such a position, assumed the risk of injury. *Macon Tel. Pub. Co. v. Graden*, 79 Ga. App. 230, supra, was distinguished on the ground that there the injured spectator was in the area designated for spectators at a "soap-box derby."

In *Rose v. Morris*, 97 Ga. App. 764 (104 SE2d 485), where a golfer was struck by a "hooked" ball, we held that although a golf player must give adequate notice to those who are in apparent danger of getting hit by a ball, nevertheless people who are on a golf course must assume the risk of being injured from a deflected, hooked or sliced ball. In *Thomas v. Shaw*, 217 Ga. 688 (124 SE2d 396) (one Justice dissenting) the Supreme Court held that while it is true that golf players assume the risk of dangers ordinarily incident to the game, an exception to this rule exists where the defendant, after driving his ball, saw or should have seen that the hooked ball was proceeding toward the plaintiff and failed to give warning after seeing that the ball would probably strike him.

In *Swope v. Farrar*, 66 Ga. App. 52, 57 (17 SE2d 92) we indicated that a patron of a skating rink assumes the ordinary risks pertaining to the activity but does not as a matter of law assume the risk of injury that might arise out of the reckless skating of another patron. In *LaHoste v. Yaarab Mounted Patrol*, 89 Ga. App. 397 (79 SE2d 570), we held that the plaintiff, injured by a rearing horse he was riding, had notice that the horse might rear up on its hind legs, assumed the risk of his voluntary undertaking and was barred from recovery as a matter of law. And in *Hale v. Davies*, 86 Ga. App. 126, 129 (70 SE2d 923), we held it "sound and reasonable to say that a student, a normal boy of the age of the plaintiff in this case, who engages in practicing or playing football assumes or takes the risk of being injured while so engaged. . ." And compare *Roberts v. King*, 102 Ga. App. 518 (116 SE2d 885).

From a consideration of these cases involving the assumption-of-risk doctrine we conclude that the doctrine is applicable in the case sub judice if the facts demand its application. It becomes necessary, therefore, to examine with particularity the evidence before the court on motion for summary judgment.

It is important to note at this point that this is not a case of a defectively constructed or maintained motor-scooter or track as in *Carlyle v. Goette*, supra; of a roller coaster with defective cars, conveyor-chain motor, blocks, timbers and track as in *Braswell v. Blackwell*, 81 Ga. App. 586 (59 SE2d 515); of a unique and unusual injury sustained in a "Moon Rocket," the side of which had become highly heated as in *Harrison v. Southeastern Fair Assn.*, 104 Ga. App. 596 (122 SE2d 330); or of injuries sustained by a fall from a "Scrambler" when the gate opened as in *Amusements of America v. Schatz*, 114 Ga. App. 627 ( SE2d ).

There was no unique, unusual or extraordinary occurrence in the ride itself or in the circumstances surrounding plaintiff's injury. In regard to the actual ride and to the injuries received, plaintiff testified as follows: "Well, when was it you first noticed that anything was amiss with you? A. Oh, I started feeling funny right after I got off the ride. I felt kind of dizzy and something just felt real funny inside me and—Q. How

long after you got off? A. It wasn't anything real bad wrong at that time. I just felt, I don't know, weak right after I got off the ride, and we continued to walk around and—Q. Let me ask you one thing while I think about it, during the course of this ride you weren't thrown out of the car or anything, were you? A. Oh, no. Q. You were still in the seat and in the car where you were supposed to be riding? A. Yes. Q. Throughout the course of this ride, whatever directions it took? A. Yes."

\* \* \*

"Q. During the ride was there any accident, that is, did any of the cars run off the tracks or anything happen—A. Not to my knowledge. Q. —that wasn't part of the ride that you know of? A. No, not to my knowledge. Q. Whatever happened was part of the ride is what I am getting at, is that right? A. Whatever happened was a part of the ride. Q. The way the car went is the way it was supposed to go as part of that ride, the going uphill and downhill and side to side? A. So far as I know, yes. Q. —and changing directions and all that business? A. Yes, so far as I know."

Plaintiff testified as to her familiarity with roller coasters in general as follows: "Q. What kind of rides had you ridden [at the Southeastern Fair]? A. Oh, the ferris wheel. I've never ridden any roller coaster or anything like that. Q. You have seen it up there, though? A. Oh, yes, I've seen it. Q. How many times had you seen that roller coaster in operation at the fair? A. Several times. Q. You know what it is, then? A. Yes. Q. Cars that go up and down and around and all that business? A. Oh, yes. Q. Has your sister ridden one of those? A. I think she has. She's a daredevil."

In regard to her knowledge of the conditions before she chose to place herself on this particular amusement device, plaintiff testified as follows: "Q. After you walked around this place for thirty or forty minutes and looked around and saw all this business, did you see this Wild Mouse ride during the time you were walking around? A. Yes. Q. What kind of ride was it? What did you see as you were walking around before you rode it? What did it look like? A. You mean the Wild Mouse, what

did it look like? Q. Yes. A. Well, it's just like a roller coaster on a small scale. That's what it looked like to me, just cars on a track that goes all around. Q. Does it go uphill? A. Uphill and downhill and around. Q. Side to side? A. Side to side and 90-degree angle about a hundred miles an hour. Q. Goes pretty fast and goes all directions, does it? A. Yes. Q. Well, did you see this before you got on it? A. Yes, I saw it. Q. Did you see it in operation before you got on it? A. Yes. Q. Did you watch it go two or three times before you and your date and your sister and her date got on it? A. I just saw it go, you know, in operation. I don't know how many times."

*    *    *

"Q. Well, let me back up just a minute. Did you all stand and watch this thing go around several times before you all decided to ride it? A. We just—we saw it in operation, yes. Q. When it was in operation, were the people on there yelling? A. Yes. Q. Making a lot of racket? A. They sure were. Q. Squealing and carrying on? A. Yes. Q. A lot of girls on there squealing? A. I don't know if they were girls or what. Q. A lot of folks making noises, though? A. Yes. You find that on most any ride. Q. Well, it was sort of a thrill ride I take it, was it? A. Thrill? Q. Sort of a thrill ride. You didn't expect it to ride like an automobile would ride, did you? A. Oh, gosh, no. It was a thrill ride. Q. Ma'am? A. You would think it was going to be, you know, a thrill ride, any of those rides out there. That's what you think when you get on them."

Under this testimony of plaintiff, and in view of the fact that the only undisposed-of charges of negligence relate to the speed at which the device was operated, we conclude that the doctrine of assumption of risk operates to bar a recovery. The speed of the car is shown not to be an unobservable defect in design, construction, maintenance or operation but an intentional attribute which was obvious and expected by plaintiff and necessary to the purpose of the device. The forces generated by the changes of speed and direction were not obscure dangers but were ordinary, necessary and inherent in the device itself and

were part of the thrill bargained for. As such, plaintiff accepted them as normal hazards of the amusement device and assumed the risks actually anticipated and naturally arising therefrom. As stated in Kahalili v. Rosecliff Realty, Inc., 46 N. J. Super. 1 (133 A2d 688): "It is common knowledge that a roller coaster is one of the more thrilling types of 'rides' found in amusement parks and that its attraction lies in the exhilaration produced by the speed and suddenness of its movements. . . . [L]urches, as such, are not erratic or unusual on roller coasters. It is the lurches, the sudden movements, the rapid turns and plunges, which provide the very thrills which plaintiff was seeking. They are ordinary, not unusual, in such an apparatus. . . It must be remembered that the proprietor of an amusement park owes no duty to protect patrons from the obvious risks that are necessarily incidental to the use of the device." Were this a case of the car leaving the tracks, of the structure collapsing, of a sudden, unexpected, and unusual movement of the car, or of other obscure or unobservable risks, unexpected dangers or unseen defects engendered by defendant's negligence in the design, construction, maintenance or operation of the device, a different conclusion might result.

What we rule here, while not controlled by the cases from our courts cited above because of significant factual distinctions, is in full accord with their rationales. Moreover, it is in accord with factually similar cases from other jurisdictions and with the rule as stated in secondary authorities. E.g., "A person who rides or uses an amusement device assumes the hazards naturally and obviously arising from the proper use and operation of the device, such as the hazards inherent in the operation of a miniature car or scooter, if it is properly designed, constructed, and maintained." 4 AmJur2d 229, Amusements and Exhibitions, § 99. Applications of the rule may be found in Murphy v. Steeplechase Amusement Co., 250 N. Y. 479 (166 NE 173) ("the Flopper"); Macabee v. Miller, 316 Ill. App. 157 (44 NE2d 341) ("Loop-o-plane"); Kemp v. Coney Island, Inc., 32 Ohio L. Abs. 630 (31 NE2d 93) ("Loop-the-loop"); Myers v. Park Play, Inc., 35 Ohio App. 336 (172 NE 394) ("Dodgem" bumper cars); Sullivan v. Ridgeway Const. Co., 236 Mass. 75 (127 NE

543) (slide device with revolving belt as landing point); Lumsden v. L. A. Thompson Scenic R. Co., 114 N.Y. Supp. 421 (130 App. Div. 209) (roller coaster); Pointer v. Mountain R. Const. Co., 269 Mo. 104 (189 SW 805) (roller coaster); Toroian v. Parkview Amusement Co., 331 Mo. 700 (56 SW2d 134) ("Heyday"—risk of mechanical failure may even be assumed where obvious); Ramsey v. Fontaine Ferry Enterprises, Inc., 314 Ky. 218 (234 SW2d 738) (bumper motor scooter); Schmidt v. Fontaine Ferry Enterprises, Inc. (Ky.) 319 SW2d 468 (sliding board three stories high, with two bumps or dips); Hook v. Lakeside Park Co., 142 Colo. 277 (351 P2d 261) ("Loop-o-plane"); Gardner v. G. Howard Mitchell, Inc., 107 N. J. L. 311 (153 A. 607) ("Dodgem" bumper cars); Murphy v. White City Amusement Co., 242 Ill. App. 56 ("The Chutes").

Let us have a look at some of these cases.

In Murphy v. White City Amusement Co., supra, plaintiff was injured while riding down "The Chutes," an inclined plane rising at an angle of about 45 degrees to a height of 55 or 60 feet. Passengers came down the incline in boats about 35 or 40 miles per hour striking water in a pond at the bottom, causing the boat to bounce. It was alleged that the boats were operated in a dangerous manner in that they were permitted to slide down the plane at a high and dangerous rate of speed and to strike the water at the bottom with great force and violence. The court, in affirming a directed verdict for the defendant, observed: "Plaintiff knew that she was contracting for a swift ride down a steep incline in a boat which bounced violently when it struck the water at the bottom. Her contract of carriage was subject to the dangers incident to the experience. She testified that she took the ride to receive the thrill caused by such dangers. The factor of danger was one of the things she contracted for."

In Schmidt v. Fontaine Ferry Enterprises, supra, plaintiff was injured when he landed on his back after going over the second hump of a sliding board three stories high. In affirming a directed verdict for the defendant the court said: "In the present case plaintiff's evidence did not show any defect in the construction or operation of the slide. The slide was an unusual

appliance which was intended to be resorted to by persons who desired to assume the risks which its use clearly involved. A certain feeling of hazard will arise in the minds of those who ride on it, and this is the thing that makes it attractive. To hold defendant liable under the circumstances would in our opinion make it an insurer."

In Pointer v. Mountain R. Const. Co., supra, plaintiff was injured on a roller coaster called "The Racer Dips" when he was jostled about and his foot got out of the car and struck an object. The court, in rejecting the doctrine of res ipsa loquitur and affirming a directed verdict for defendant, concluded: "Still proceeding upon the theory that the relation of plaintiff to defendant is that of carrier and passenger, yet we must not blind ourselves to the kind of carriage plaintiff was contracting for, and the relative duties of the parties under the facts. Plaintiff knew he was contracting for carriage upon a pleasure device, which device with its tracks of dips and curves was before him, as a circular swing stands before one contracting to ride upon it. He knew he was making no contract for a Pullman car upon the level tracks of a steam railroad. When he contracted for this peculiar carriage, it was written in such contract, by the law, that he must subject himself to the inconveniences, jerks, and even dangers usually incident to that mode of conveyance."

In Lumsden v. L. A. Thompson Scenic R. Co., supra, the court reversed a judgment for plaintiff who was thrown from the roller coaster and ordered a new trial for the defendant. The court there held: "Here was an appliance which was devised for the entertainment of persons visiting this place of amusement. The attraction was the rapid motion of the car in going down these steep inclines. The plaintiff knew the general nature of the ride that she was about to take. She selected her own seat, and voluntarily placed herself in a position in the car from which she was thrown, and she assumed the risk of being thrown from the car by reason of its usual operation. The car necessarily gave a lurch as it started down the incline. So far as appears, there was nothing unusual or extraordinary about the motion of the car; nor was there the

slightest evidence that the car was out of order, or that anything happened upon this trip that was not the usual occurrence made necessary by the motion of the car. . . The attractiveness of these appliances depends solely upon the sensation that the rapid change of speed gives the person using it."

In Kemp v. Coney Island, Inc., supra, a "loop-the-loop" case, the court stated, in affirming a directed verdict for defendant: "Plaintiff's injuries seemed to be due to her inability to properly adjust herself to the ordinary operation of the device, the risk of which she assumed."

The amusement device in Murphy v. Steeplechase Amusement Co., supra, was "The Flopper," a moving belt running upward on an inclined plane on which patrons sat or stood. Many of the patrons were unable to keep their feet because of the movement of the belt and were thrown backward or aside. Plaintiff was injured when he stepped upon the belt and was thrown to the floor by a sudden jerk. The complaint alleged that the belt was dangerous to life and limb in that it stopped and started violently and suddenly and was not properly equipped to prevent injuries to persons who were using it without knowledge of its dangers. It was further alleged that the device was operated at a fast and dangerous rate of speed and was not supplied with a proper guardrail or other device to prevent a fall. Chief Justice Cardozo, in delivering the opinion of the court, reversing a verdict and judgment for plaintiff, asserted: "Something more was here, as every one understood, than the slowly moving escalator that is common in shops and public places. A fall was foreseen as one of the risks of the adventure. There would have been no point to the whole thing, no adventure about it, if the risk had not been there. The very name, above the gate, 'the Flopper,' was warning to the timid. If the name was not enough, there was warning more distinct in the experience of others. We are told by the plaintiff's wife that the members of her party stood looking at the sport before joining in it themselves. Some aboard the belt were able, as she viewed them, to sit down with decorum or even to stand and keep their footing; others jumped or fell. The tumbling bodies and the screams and laughter supplied the

merriment and fun. . . Whether the movement of the belt was uniform or irregular, the risk at greatest was a fall. This was the very hazard that was invited and foreseen. [Citations omitted].

"Volenti non fit injuria. One who takes part in such a sport accepts the dangers that inhere in it so far as they are obvious and necessary, just as a fencer accepts the risk of a thrust by his antagonist or a spectator at a ball game the chance of contact with the ball. . . The plaintiff was not seeking a retreat for meditation. Visitors were tumbling about the belt to the merriment of onlookers when he made his choice to join them. He took the chance of a like fate, with whatever damage to his body might ensue from such a fall. The timorous may stay at home."

The motion for summary judgment should have been granted.

*Judgment affirmed in part; reversed in part. Bell, P. J., and Jordan, J., concur.*