659 S.E.2d 171

**Ann THOMPSON, Claimant, for John Michael HARVEY, Deceased, Employee, Appellant**

v.

**CISSON CONSTRUCTION CO., Employer and Ohio Casualty Co., Carrier, Respondents.**

No. 4339.

Court of Appeals of South Carolina.

Heard Jan. 9, 2008.
Decided Feb. 1, 2008.
Rehearing Denied April 18, 2008.

---

138

142

146

Linda B. McKenzie, of Greenville, for Appellant.

Weston Adams, III, George D. Gallagher, and John G. Coggiola, of Columbia, for Respondent.

ANDERSON, J.:

In this workers' compensation case, Ann Thompson (Thompson), mother of deceased employee John Michael Harvey (Harvey), appeals the circuit court's decision reversing the Appellate Panel's award of death benefits pursuant to section 42-9-290 of the South Carolina Code of Laws. We affirm.

## FACTUAL/PROCEDURAL BACKGROUND

Harvey sustained a work-related injury to his right knee and back on January 12, 2000. As a result of his initial injuries, Harvey later claimed an aggravation of a pre-existing psychiatric condition. His employer, Cisson Construction, and its carrier, Ohio Casualty (collectively Cisson) admitted the right knee and back injuries and provided temporary disability and medical benefits. Cisson denied aggravation of the pre-existing psychiatric condition.

A plethora of emotional problems, including substance abuse, depression, anxiety, suicide attempts, and multiple hospitalizations characterized Harvey's medical history. Previous medical records indicated a diagnosis of bipolar affective disorder. Yet, for approximately four or five years prior to his January 12, 2000 work accident, Harvey's emotional status was stable; he had not taken any medication for depression and had not attempted suicide during that period. In his own words, Harvey averred he "was dealing with it pretty good."

Notwithstanding numerous evaluations and medical treatments for his compensable injuries, Harvey continued to experience significant pain. Medications, including Oxycontin, were prescribed. Harvey's injuries, combined with the medications, virtually immobilized him. Other than taking care of his personal hygiene and occasionally preparing a meal for himself, he was able to do very little.

Harvey's treating physician, Dr. David Shallcross, noted that "despite being seen by many physicians, we have not

found anything seriously wrong with this patient to explain his pain." Medical examination revealed no signs of neurological dysfunction, and Harvey was "clear to ambulate without any restrictions." Dr. Shallcross released Harvey at maximum medical improvement with a 5% whole person impairment rating and recommended treatment for his pre-existing emotional condition, regardless of his physical status.

Harvey began psychiatric treatment with Dr. Mario Galvarino in April of 2001. Dr. Galvarino summarized Harvey's mental state in his initial evaluation: "This individual is sad, apprehensive and does nothing at home. He sleeps. He has difficulty. He is very angry, apprehensive, irritable, snappy. Concentration and memory are poor. He feels hopeless, helpless, useless and very guilty. He feels good-for-nothing and wants to die, but he is not actively suicidal." Dr. Galvarino opined, "[T]he patient's depression and manic depression have considerably and significantly worsened since his injury." In May of 2001, Dr. Galvarino advised Harvey's attorney that the injuries he sustained in the "on-the-job accident with resulting chronic pain and depression have rendered him permanently and totally disabled."

On March 4, 2002, Thompson, Harvey's mother, found him dead from a drug overdose. Pathologist Brett Woodard reported, "[T]he cause of death was Oxycontin over dosage. Based on the number of residual pills and pill debris within the stomach and the previous psychiatric history of the deceased, the manner of death is suicide."

Harvey had moved in to live with Thompson after breaking up with his girlfriend approximately nine months prior to his death. Thompson sought death benefits under section 42–9–290 of the South Carolina Code of Laws, contending Harvey's death by suicide was the result of emotional trauma or depression secondary to his compensable work accident.

The single commissioner found, *inter alia,*: (1) Harvey's work related injury aggravated his pre-existing psychiatric condition; (2) the aggravation of the pre-existing psychiatric condition was compensable; (3) Harvey reached maximum medical improvement on May 25, 2001, with an impairment rating of 25% loss of use to his back and 20% loss of use to his right leg; (4) Harvey's back and right knee injuries, when

combined with the severe aggravation of his pre-existing emotional problems, rendered him totally and permanently disabled, pursuant to section 42–9–10; (5) Harvey's death was the result of suicide; and (6) the suicide resulted from and was directly linked to Harvey's severe emotional condition brought on by his compensable injuries. The single commissioner awarded Thompson death benefits pursuant to sections 42–9–140 and 42–9–290, including $2500 for burial expenses. The Appellate Panel affirmed the single commissioner, with the exception of the award for burial expenses.

On appeal to the Court of Common Pleas the circuit judge reversed the Appellate Panel's decision as a matter of law, holding: "Compensation for Claimant's suicide is specifically barred by the plain language of § 42–9–60 because the event for which Thompson seeks compensation—Claimant's death by suicide—was occasioned by Claimant's willful intent to kill himself." As an alternate ground for reversal, the circuit judge ruled: "As a matter of law, Claimant's intent to kill himself was not negated by a spontaneous or uncontrollable impulse, or other mental derangement depriving him of normal judgment negating his willful intention;" and "Claimant's suicide two years after his work related accident is not a 'natural consequence' flowing from such accident."

## ISSUES

1. Does section 42–9–60 of the South Carolina Code of Laws bar death benefits to the deceased employee's mother when the cause of death was suicide?

2. Was the deceased employee's suicide the result of spontaneous, impulsive, or instinctive conduct, without deliberate or formed intention, or without conscious volition to produce death, thus negating his willful intent to kill himself?

3. Was the employee's suicide a "natural consequence" flowing from his original compensable accident?

## STANDARD OF REVIEW

"The South Carolina Administrative Procedures Act governs judicial review of a decision of the workers' compensation commission." *Lark v. Bi–Lo, Inc.*, 276 S.C. 130, 134, 276 S.E.2d 304, 306 (1981); *Bass v. Isochem*, 365 S.C. 454, 467, 617

S.E.2d 369, 376 (Ct.App.2005) *cert. dismissed as improvidently granted* Aug. 2007; *Hargrove v. Titan Textile Co.*, 360 S.C. 276, 288, 599 S.E.2d 604, 610 (Ct.App.2004). Pursuant to the APA, an appellate court's review is limited to deciding whether the Appellate Panel's decision is unsupported by substantial evidence or is controlled by some error of law. *Grant v. Grant Textiles*, 372 S.C. 196, 200, 641 S.E.2d 869, 871 (2007); S.C.Code Ann. § 1–23–380(A)(5)(Supp.2006).

## I. Substantial Evidence Standard

■ The judicial review of the Appellate Panel's factual findings is governed by the substantial evidence standard. *Gadson v. Mikasa Corp.*, 368 S.C. 214, 221, 628 S.E.2d 262, 266 (Ct.App.2006); *Frame v. Resort Servs., Inc.*, 357 S.C. 520, 527, 593 S.E.2d 491, 494 (Ct.App.2004); *Corbin v. Kohler Co.*, 351 S.C. 613, 617, 571 S.E.2d 92, 94–95 (Ct.App.2002); *Lockridge v. Santens of America, Inc.*, 344 S.C. 511, 515, 544 S.E.2d 842, 844 (Ct.App.2001). The Appellate Panel's decision must be affirmed if supported by substantial evidence in the record. *Shuler v. Gregory Elec.*, 366 S.C. 435, 440, 622 S.E.2d 569, 571 (Ct.App.2005) (citing *Sharpe v. Case Produce, Inc.*, 336 S.C. 154, 160, 519 S.E.2d 102, 105 (1999)). A reviewing court may not substitute its judgment for the judgment of the agency as to the weight of the evidence on questions of fact. S.C.Code Ann. § 1–23–380(A)(5)(d)(e)(Supp.2006); *see also Hall v. United Rentals, Inc.*, 371 S.C. 69, 77, 636 S.E.2d 876, 881 (Ct.App.2006). However, a reviewing court may reverse or modify a decision of the Appellate Panel if the findings, inferences, conclusions, or decisions of the panel are "clearly erroneous in view of the reliable, probative and substantial evidence on the whole record." S.C.Code Ann. § 1–23–380(A)(5)(e)(Supp.2006); *Bass v. Kenco Group*, 366 S.C. 450, 457, 622 S.E.2d 577, 580 (Ct.App.2005); *Bursey v. S.C. Dep't of Health & Envtl. Control*, 360 S.C. 135, 141, 600 S.E.2d 80, 84 (Ct.App.2004) *aff'd* 369 S.C. 176, 631 S.E.2d 899 (2006).

■ It is not within the appellate court's province to reverse the Appellate Panel's factual findings if they are supported by substantial evidence. *Etheredge v. Monsanto Co.*, 349 S.C. 451, 454, 562 S.E.2d 679, 681 (Ct.App.2002) (citing *Hoxit v. Michelin Tire Corp.*, 304 S.C. 461, 405 S.E.2d 407 (1991)); *Muir v. C.R. Bard, Inc.*, 336 S.C. 266, 282, 519

S.E.2d 583, 591 (Ct.App.1999). Substantial evidence is not a mere scintilla of evidence, nor the evidence viewed blindly from one side of the case, but is evidence which, considering the record as a whole, would allow reasonable minds to reach the conclusion the administrative agency reached in order to justify its action. *Pratt v. Morris Roofing, Inc.*, 357 S.C. 619, 622, 594 S.E.2d 272, 274 (2004); *Jones v. Georgia–Pacific Corp.*, 355 S.C. 413, 417, 586 S.E.2d 111, 113 (2003); *Brown v. Greenwood Mills, Inc.*, 366 S.C. 379, 392, 622 S.E.2d 546, 554 (Ct.App.2005) *cert. denied* Jan. 2007; *Broughton v. South of the Border*, 336 S.C. 488, 495, 520 S.E.2d 634, 637 (Ct.App. 1999). The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence. *Sharpe*, 336 S.C. at 160, 519 S.E.2d at 105; *Smith v. NCCI Inc.*, 369 S.C. 236, 247, 631 S.E.2d 268, 274 (Ct.App.2006); *DuRant v. S.C. Dep't of Health & Envtl. Control*, 361 S.C. 416, 420, 604 S.E.2d 704, 707 (Ct.App.2004).

The Appellate Panel is the ultimate fact finder in Workers' Compensation cases and is not bound by the single commissioner's findings of fact. *Isochem*, 365 S.C. at 468, 617 S.E.2d at 376; *Frame*, 357 S.C. at 528, 593 S.E.2d at 495; *Muir*, 336 S.C. at 281, 519 S.E.2d at 591. The final determination of witness credibility and the weight assigned to the evidence is reserved to the Appellate Panel. *Shealy v. Aiken County*, 341 S.C. 448, 455, 535 S.E.2d 438, 442 (2000); *Frame*, 357 S.C. at 528, 593 S.E.2d at 495. Where there are conflicts in the evidence over a factual issue, the findings of the Appellate Panel are conclusive. *Brown*, 366 S.C. at 393, 622 S.E.2d at 554; *Etheredge*, 349 S.C. at 455, 562 S.E.2d at 681; *see also Mullinax v. Winn–Dixie Stores, Inc.*, 318 S.C. 431, 435, 458 S.E.2d 76, 78 (Ct.App.1995) ("Where the medical evidence conflicts, the findings of fact of the [Appellate Panel] are conclusive.").

The findings of the Appellate Panel are presumed correct and will be set aside only if unsupported by substantial evidence. *Kenco Group*, 366 S.C. at 458, 622 S.E.2d at 581; *Frame*, 357 S.C. at 528, 593 S.E.2d at 495; *Broughton*, 336 S.C. at 496, 520 S.E.2d at 637. The appellate court is prohibited from overturning findings of fact of the Appellate Panel

unless there is no reasonable probability the facts could be as related by the witness upon whose testimony the finding was based. *Liberty Mut. Ins. Co. v. South Carolina Second Injury Fund*, 611 S.E.2d 297, 301, 363 S.C. 612, 621 (Ct.App. 2005) *cert. denied* July 2007; *Hargrove*, 360 S.C. at 290, 599 S.E.2d at 611; *Etheredge*, 349 S.C. at 455–56, 562 S.E.2d at 681. The Appellate Panel's factual findings will normally be upheld; however, such a finding may not be based upon surmise, conjecture, or speculation, but must be founded on evidence of sufficient substance to afford a reasonable basis for it. *Tiller v. Nat'l Health Care Ctr. of Sumter*, 334 S.C. 333, 339, 513 S.E.2d 843, 845 (1999); *Muir*, 336 S.C. at 282, 519 S.E.2d at 591; *Sharpe v. Case Produce Co.*, 329 S.C. 534, 543, 495 S.E.2d 790, 794 (Ct.App.1997) *rev'd on other grounds*.

## II. Errors of Law

An appellate court may reverse or modify the decision of the Appellate Panel if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are affected by other error of law. S.C.Code Ann. § 1–23–380(A)(5)(d) (Supp.2006); *Porter v. Labor Depot*, 372 S.C. 560, 567, 643 S.E.2d 96, 100 (Ct.App. 2007) *cert. denied* Dec. 2007; *Bass v. Isochem*, 365 S.C. 454, 467, 617 S.E.2d 369, 376 (Ct.App.2005) *cert dismissed as improvidently granted* Aug. 2007; *Pratt v. Morris Roofing, Inc.*, 353 S.C. 339, 344, 577 S.E.2d 475, 477 (Ct.App.2003) *aff'd as modified* 357 S.C. 619, 594 S.E.2d 272 (2004).

Section 14–3–330 of the South Carolina Code (Supp.2006) vests the South Carolina Supreme Court with "appellate jurisdiction for correction of errors of law in law cases. . . ." Citing both section 14–3–330 and South Carolina Constitution, article V, section 5, the Supreme Court has held an appellate court may decide novel questions of law with "no particular deference to the lower court." *Madison ex rel. Bryant v. Babcock Ctr., Inc.*, 371 S.C. 123, 134, 638 S.E.2d 650, 656 (2006); *Clark v. Cantrell*, 339 S.C. 369, 378, 529 S.E.2d 528, 533 (2000). Section 14–8–200(a) of the South Carolina Code provides the Court of Appeals "shall apply the same scope of review that the Supreme Court would apply in a similar case." (Supp. 2006).

Pellucidly, an appellate court's review of factual findings in a workers' compensation case is governed and controlled by the substantial evidence rule. However, an appellate court freely and absolutely reviews a trial court's decision concerning an issue of law. No passivity or complaisance is owed or given to the ruling of the Appellate Panel or circuit judge in this context. The highly deferential standards statutorily and universally applied in reviewing issues of fact, such as the "clearly erroneous" and the "manifest error" standards, have no efficacy in regard to an issue of law. The South Carolina Court of Appeals exercises freedom and independence in deciding an issue of law in a workers' compensation case.

In the instant case, the standard of review applied is bifurcated. Whether section 42–9–60 of the South Carolina Code of Laws (Supp. 2006) bars death benefits to the deceased employee's mother when the cause of death was suicide is a question of law. Hence, we review the Appellate Panel's ruling to determine if it is affected by an error of law. *See Creech v. Ducane Co.*, 320 S.C. 559, 562, 467 S.E.2d 114, 116 (Ct.App.1995) (recognizing determination of whether a claimant sustained an "injury by accident" within the meaning of the workers' compensation statute is a matter of law). In addition, when the evidence gives rise to but one reasonable inference the question becomes one of law for the courts to decide. *Kinsey v. Champion Am. Serv. Ctr.*, 268 S.C. 177, 181, 232 S.E.2d 720, 722 (1977); *Sharpe v. Case Produce Co.*, 329 S.C. 534, 545, 495 S.E.2d 790, 795 (Ct.App.1997) *rev'd on other grounds.*

Moreover, it is well settled that statutory interpretation is a matter of law. *Catawba Indian Tribe of S.C. v. State*, 372 S.C. 519, 524, 642 S.E.2d 751, 754 (2007); *University of Southern California v. Moran*, 365 S.C. 270, 274, 617 S.E.2d 135, 137 (Ct.App.2005); *Liberty Mut. Ins. Co. v. S.C. Second Injury Fund*, 363 S.C. 612, 621, 611 S.E.2d 297, 301 (Ct.App. 2005) *cert. denied* June 2007. Accordingly, we are free to review the construction of section 42–9–60 without deference to the Appellate Panel or circuit court. *Catawba Indian Tribe*, 372 S.C. at 524, 642 S.E.2d at 753 (citing *Moriarty v.*

*Garden Sanctuary Church of God,* 341 S.C. 320, 327, 534 S.E.2d 672, 675 (2000)).

The substantial evidence rule governs our review of whether Harvey's suicide was (1) the result of spontaneous, impulsive, or instinctive conduct, without deliberate or formed intent, or without conscious volition to produce death, thus negating his willful intention to kill himself; or (2) a "natural consequence" flowing from his original compensable accident. We may reverse the factual findings of the Appellate Panel only if they are unsupported by substantial evidence or are "clearly erroneous in view of the reliable, probative and substantial evidence on the whole record." *Liberty Mut. Ins. Co.,* 363 S.C. at 619, 611 S.E.2d at 300; *Bursey v. S.C. Dep't of Health & Envtl. Control,* 360 S.C. 135, 141, 600 S.E.2d 80, 84 (Ct.App. 2004) *aff'd* 369 S.C. 176, 631 S.E.2d 899 (2006); *S.C. Uninsured Employer's Fund v. House,* 360 S.C. 468, 470, 602 S.E.2d 81, 82 (Ct.App.2004); *Stephen v. Avins Constr. Co.,* 324 S.C. 334, 337, 478 S.E.2d 74, 76 (Ct.App.1996). Concomitantly, if the evidence is undisputed or gives rise to only one inference, we may rule as a matter of law. *Gibson v. Spartanburg Sch. Dist. No. 3,* 338 S.C. 510, 518, 526 S.E.2d 725, 729 (Ct.App.2000).

## *LAW/ANALYSIS*

### I. Section 42–9–60 of the South Carolina Code of Laws

The Workers' Compensation Act provides that "[n]o compensation shall be payable if the injury or death was occasioned by the intoxication of the employee or by the wilful intention of the employee to injure or kill himself or another." [1] S.C.Code Ann. § 42–9–60 (Supp.2006). Cisson contends this provision bars an award of death benefits as a matter of law, because Harvey's suicide was a result of his willful intention to kill himself. We agree the strict construc-

---

1. The South Carolina General Assembly amended section 42–9–60 on June 25, 2007, by adding the following language to the existing text: "In the event that any person claims that the provisions of this section are applicable in any case, the burden of proof shall be upon such person." This amendment and other legislative changes in the Workers' Compensation Act apply only to injuries occurring on or after the effective date of the 2007 enactment, July 1, 2007. Act No. 111, 2007 S.C. Acts.

tion of section 42–9–60 bars compensation for death that results from "the wilful intention" of an employee "to injure or kill himself." *Id.*

## A. Principles of Statutory Construction

The issue of interpretation of a statute is a question of law for the court. *Univ. of S. California v. Moran,* 365 S.C. 270, 275, 617 S.E.2d 135, 137 (Ct.App.2005); *see also Catawba Indian Tribe of South Carolina v. State of South Carolina,* 372 S.C. 519, 524, 642 S.E.2d 751, 753 (2007) *cert. denied* Oct. 1, 2007; *Charleston County Parks & Recreation Comm'n v. Somers,* 319 S.C. 65, 67, 459 S.E.2d 841, 843 (1995).

The cardinal rule of statutory interpretation is to determine the intent of the legislature. *Bass v. Isochem,* 365 S.C. 454, 459, 617 S.E.2d 369, 377 (Ct.App.2005) *cert. dismissed as improvidently granted* Aug. 2007; *Georgia–Carolina Bail Bonds, Inc. v. County of Aiken,* 354 S.C. 18, 22, 579 S.E.2d 334, 336 (Ct.App.2003); *Smith v. S.C. Ins. Co.,* 350 S.C. 82, 87, 564 S.E.2d 358, 361 (Ct.App.2002); *see also Gordon v. Phillips Utils., Inc.,* 362 S.C. 403, 406, 608 S.E.2d 425, 427 (2005) ("The primary purpose in construing a statute is to ascertain legislative intent."). All rules of statutory construction are subservient to the one that legislative intent must prevail if it can be reasonably discovered in the language used, and that language must be construed in the light of the intended purpose of the statute. *McClanahan v. Richland County Council,* 350 S.C. 433, 438, 567 S.E.2d 240, 242 (2002); *Ray Bell Constr. Co. v. Sch. Dist. of Greenville County,* 331 S.C. 19, 26, 501 S.E.2d 725, 729 (1998); *State v. Morgan,* 352 S.C. 359, 365–66, 574 S.E.2d 203, 206 (Ct.App.2002); *State v. Hudson,* 336 S.C. 237, 246, 519 S.E.2d 577, 581 (Ct.App.1999). "Once the legislature has made [a] choice, there is no room for the courts to impose a different judgment based upon their own notions of public policy." *S.C. Farm Bureau Mut. Ins. Co. v. Mumford,* 299 S.C. 14, 19, 382 S.E.2d 11, 14 (Ct.App. 1989).

The legislature's intent should be ascertained primarily from the plain language of the statute. *State v. Landis,* 362 S.C. 97, 102, 606 S.E.2d 503, 505 (Ct.App.2004); *Morgan,* 352 S.C. at 366, 574 S.E.2d at 206; *Stephen v. Avins*

*Constr. Co.*, 324 S.C. 334, 339, 478 S.E.2d 74, 77 (Ct.App.1996). The language must be read in a sense which harmonizes with its subject matter and accords with its general purpose. *Mun. Ass'n of S.C. v. AT&T Commc'ns of S. States, Inc.*, 361 S.C. 576, 580, 606 S.E.2d 468, 470 (2004); *Hitachi Data Sys. Corp. v. Leatherman*, 309 S.C. 174, 178, 420 S.E.2d 843, 846 (1992); *Morgan*, 352 S.C. at 366, 574 S.E.2d at 206; *Hudson*, 336 S.C. at 246, 519 S.E.2d at 582.

 When a statute's terms are clear and unambiguous on their face, there is no room for statutory construction and a court must apply the statute according to its literal meaning. *Miller v. Aiken*, 364 S.C. 303, 307, 613 S.E.2d 364, 366 (2005); *Carolina Power & Light Co. v. City of Bennettsville*, 314 S.C. 137, 139, 442 S.E.2d 177, 179 (1994). If a statute's language is unambiguous and clear, there is no need to employ the rules of statutory construction and this Court has no right to look for or impose another meaning. *Tilley v. Pacesetter Corp.*, 355 S.C. 361, 373, 585 S.E.2d 292, 298 (2003); *Paschal v. State Election Comm'n*, 317 S.C. 434, 436, 454 S.E.2d 890, 892 (1995); *see also City of Camden v. Brassell*, 326 S.C. 556, 561, 486 S.E.2d 492, 495 (Ct.App.1997) ("Where the language of the statute is clear and explicit, the court cannot rewrite the statute and inject matters into it which are not in the legislature's language."). What a legislature says in the text of a statute is considered the best evidence of the legislative intent or will. *Bayle v. S.C. Dep't of Transp.*, 344 S.C. 115, 122, 542 S.E.2d 736, 740 (Ct.App.2001). The words of a statute must be given their plain and ordinary meaning without resorting to subtle or forced construction. *Durham v. United Cos. Fin. Corp.*, 331 S.C. 600, 604, 503 S.E.2d 465, 468 (1998); *Adkins v. Comcar Indus., Inc.*, 323 S.C. 409, 411, 475 S.E.2d 762, 763 (1996); *Worsley Cos. v. S.C. Dep't of Health & Envtl. Control*, 351 S.C. 97, 102, 567 S.E.2d 907, 910 (Ct.App.2002); *see also Timmons v. S.C. Tricentennial Comm'n*, 254 S.C. 378, 402, 175 S.E.2d 805, 817 (1970) (observing that where the language of the statute is clear and explicit, the court cannot rewrite the statute and inject matters into it that are not in the legislature's language). Under the plain meaning rule, it is not the court's place to change the meaning of a clear and unambiguous statute. *Hodges v. Rainey*, 341 S.C. 79, 85, 533 S.E.2d 578, 581 (2000); *Bayle*, 344 S.C. at 122, 542 S.E.2d at 739.

If the language of an act gives rise to doubt or uncertainty as to legislative intent, the construing court may search for that intent beyond the borders of the act itself. *Morgan,* 352 S.C. at 367, 574 S.E.2d at 207; *see also Wade v. Berkeley County,* 348 S.C. 224, 229, 559 S.E.2d 586, 588 (2002) ("[W]here a statute is ambiguous, the Court must construe the terms of the statute."). An ambiguity in a statute should be resolved in favor of a just, beneficial, and equitable operation of the law. *Hudson,* 336 S.C. at 247, 519 S.E.2d at 582; *Brassell,* 326 S.C. at 561, 486 S.E.2d at 495; *City of Sumter Police Dep't v. One (1) 1992 Blue Mazda Truck,* 330 S.C. 371, 376, 498 S.E.2d 894, 896 (Ct.App.1998). In construing a statute, the court looks to the language as a whole in light of its manifest purpose. *State v. Dawkins,* 352 S.C. 162, 166, 573 S.E.2d 783, 785 (2002); *Adams v. Texfi Indus.,* 320 S.C. 213, 217, 464 S.E.2d 109, 112 (1995); *Brassell,* 326 S.C. at 560, 486 S.E.2d at 494.

A statute as a whole must receive a practical, reasonable, and fair interpretation consonant with the purpose, design, and policy of the lawmakers. *See Liberty Mut. Ins. Co. v. S.C. Second Injury Fund,* 363 S.C. 612, 621, 611 S.E.2d 297, 301 (Ct.App.2005) *cert. denied* June 2007; *see also Georgia–Carolina Bail Bonds,* 354 S.C. at 22, 579 S.E.2d at 336 ("A statute should be given a reasonable and practical construction consistent with the purpose and policy expressed in the statute."). The real purpose and intent of the lawmakers will prevail over the literal import of the words. *Browning v. Hartvigsen,* 307 S.C. 122, 125, 414 S.E.2d 115, 117 (1992).

Courts will reject a statutory interpretation which would lead to a result so plainly absurd that it could not have been intended by the legislature or would defeat the plain legislative intention. *Unisun Ins. Co. v. Schmidt,* 339 S.C. 362, 368, 529 S.E.2d 280, 283 (2000); *Kiriakides v. United Artists Commc'ns, Inc.,* 312 S.C. 271, 275, 440 S.E.2d 364, 366 (1994). A court should not consider a particular clause in a statute as being construed in isolation, but should read it in conjunction with the purpose of the whole statute and the policy of the law. *See Liberty Mut. Ins. Co.,* 363 S.C. at 622, 611 S.E.2d at 302; *see also Mid–State Auto Auction v.*

*Altman,* 324 S.C. 65, 69, 476 S.E.2d 690, 692 (1996) (stating that in ascertaining the intent of the legislature, a court should not focus on any single section or provision but should consider the language of the statute as a whole).

## B. Interpretation of Section 42–9–60

### 1. Construction of South Carolina Workers' Compensation Statutes

The appellate courts are bound by precedent to strictly construe statutes enacted in derogation of the common law. *Wigfall v. Tideland Utilities, Inc.,* 354 S.C. 100, 110, 580 S.E.2d 100, 105 (2003) (citing *Gilfillin v. Gilfillin,* 344 S.C. 407, 544 S.E.2d 829 (2001)). "Workers' compensation statutes provide an exclusive compensatory system in derogation of common law rights." *Id.* It is therefore incumbent on us to strictly construe the terms of the statute, leaving it to the legislature to amend or define ambiguities. *Id.*

"Although not binding or controlling, this court gives deference to the opinion of a state agency charged with the duty and responsibility of enforcing a state statute." *Georgia–Carolina Bail Bonds, Inc. v. County of Aiken,* 354 S.C. 18, 26, 579 S.E.2d 334, 338 (Ct.App.2003). The construction of a statute by the agency charged with its administration will be accorded the most respectful consideration and will not be overruled absent compelling reasons. *Barton v. Higgs,* 372 S.C. 109, 641 S.E.2d 39 (Ct.App.2007) (citing *Dunton v. S.C. Bd. of Exam'rs in Optometry,* 291 S.C. 221, 223, 353 S.E.2d 132, 133 (1987)); *see also Buist v. Huggins,* 367 S.C. 268, 276, 625 S.E.2d 636, 640 (2006); *Daisy Outdoor Adver. Co. v. S.C. Dep't of Transp.,* 352 S.C. 113, 120, 572 S.E.2d 462, 466 (Ct.App.2002).

Our appellate courts have steadfastly followed the policy of strictly construing the terms of the workers' compensation statute. When the language of the statutory provision is plain and unambiguous, courts have consistently applied its literal meaning. *See Wigfall,* 354 S.C. at 100, 580 S.E.2d at 105; *Brown v. Bi–Lo,* 354 S.C. 436, 581 S.E.2d 836 (2003); *Barton v. Higgs,* 372 S.C. at 109, 641 S.E.2d at 39.

In *Wigfall,* the claimant attempted to extend the rule established in *Singleton v. Young Lumber Co.,* 236 S.C. 454, 114

S.E.2d 837 (1960). Under *Singleton,* an employee with one scheduled injury is limited to recovery under section 42–9–30 alone. 354 S.C. at 106, 580 S.E.2d at 103. However, if the claimant demonstrates injuries beyond the single scheduled member, he is not limited to recovery under section 42–9–30. *Id.* Wigfall sought to establish total disability by proving a single scheduled injury caused significant lost earning capacity under section 42–9–10. *Id.* at 107, 580 S.E.2d at 103.

Wigfall contended inequity resulted from:

allowing a claimant to establish total disability through a single non-scheduled injury plus a loss of earning capacity but not allowing a claimant to establish total disability through a single scheduled injury plus a significant loss of earning capacity. The result is an individual with a hernia may obtain total disability by showing lost earning capacity, while an individual with a scheduled injury may not attain total disability even if he could show the scheduled injury caused the claimant to lose his earning capacity.

*Id.* at 109, 580 S.E.2d at 104–05.

The court found Wigfall's equity argument alluring, but not sufficiently persuasive to overcome the mandate that legislative intent is the paramount concern when interpreting a statute. *Id.* at 110, 580 S.E.2d at 104–05. Construing the relevant section, the court reasoned:

Section 42–9–30 provides:

In cases included in the following schedule, the disability in each case shall be deemed to continue for the period specified and the compensation so paid for such injury shall be as specified therein, to wit:

For the loss of a leg, sixty-six and two-thirds percent of the average weekly wages during one hundred ninety-five weeks;

The term "shall" in a statute means that the action is mandatory. A plain reading of the statute is that in cases in which a claimant loses the use of a leg, the disability must continue for one hundred ninety-five weeks and the compensation must equal sixty-six and two-thirds percent of the claimant's average weekly wages. Under such a reading, Wigfall is entitled only to the scheduled benefits because he suffers solely from a scheduled disability.

*Id.* at 110–11, 580 S.E.2d at 105 (citations omitted). *Wigfall* reflects the court's adherence to the principle that the language provided in the text of a statute is the best evidence of the legislature's intent.

Similarly, the court of appeals affirmed the Appellate Panel's interpretation of section 42–1–415 of the South Carolina Code (Supp.2005) in *Barton v. Higgs.* 372 S.C. at 119, 641 S.E.2d at 44. The dispute involved workers' compensation coverage for employees of Total Home's subcontractor, Iyanel. Iyanel presented Total Home with an unsigned Certificate of Insurance, representing it had obtained workers' compensation coverage. The carrier's agent issued the Certificate of Insurance, however, without coverage being bound. Total Home sought to transfer liability for an employee's injury to the South Carolina Uninsured Employer's Fund (Fund) because it relied in good faith on Iyanel's representation that it had insurance. *Id.* at 113–14, 641 S.E.2d at 41–42.

> The relevant portion of section 42–1–415 required:

> To qualify for reimbursement [from the Uninsured Employer's Fund] under this section, the higher tier ... contractor ... must collect documentation of insurance as provided in subsection (A) on a standard form acceptable to the commission. The documentation must be collected at the time the contractor or subcontractor is engaged to perform work and must be turned over to the commission at the time a claim is filed by the injured employee.

S.C.Code Ann. § 42–1–415 (Supp.2005). The Fund argued Total Home failed to comply with all the statutory requirements by accepting an unsigned certificate as documentation of coverage. In affirming the finding that Total Home was entitled to transfer liability, we explained:

> The Fund's sole contention is that because the Certificate of Insurance was unsigned, Total Home does not meet the statutory requirement for documentation of insurance. However, the statute does not require a signed Certificate of Insurance. It merely states, "a standard form acceptable to the commission."

> . . .

> The statute gives the commission the discretion of determining what is an acceptable form. The Appellate Panel found

Iyanel's Certificate of Insurance to be a "form acceptable to the Commission." This finding was not in contravention of the literal meaning of the statute. Accordingly, we give the proper deference to the Appellate Panel in interpreting the statute. There is no compelling reason to differ with this interpretation of an acceptable form.

*Id.* at 117, 641 S.E.2d at 44.

Contrastively, the court found compelling reasons to differ with the Appellate Panel's statutory interpretation in *Brown v. Bi–Lo,* 354 S.C. 436, 438, 581 S.E.2d 836, 837 (2003). In *Brown,* the issue involved a provision requiring physicians to provide employers with information regarding a claimant's treatment. *Id.* Section 42–15–95 of the South Carolina Code mandated that:

All existing information compiled by a health care facility, as defined in Section 44–7–130, or a health care provider licensed pursuant to Title 40 pertaining directly to a workers' compensation claim must be provided to the insurance carrier, the employer, the employee, their attorneys or the South Carolina Workers' Compensation Commission, within fourteen days after receipt of written request. . . .

S.C.Code Ann. § 42–15–95 (Supp.2002).[2]

Relying on this provision, Brown's employer hired a rehabilitation nurse to contact Brown's physician regarding the cause and nature of her condition. Brown's attorney wrote letters to the nurse and treating physician, cautioning them not to engage in *ex parte* communications about Brown's treatment. When the employer complained to the Workers' Compensation Commission, Brown's attorney was instructed to "cease and desist from obstructing contact, including contact involving *ex parte* communications, meetings, correspondence, and/or answering questions in written and oral form, between the treating physician and the defendant's representatives." *Brown,* 354 S.C. at 438, 581 S.E.2d at 837.

The court of appeals affirmed the Appellate Panel's order, reasoning that allowing employers and their representatives to communicate directly with treating physicians might facilitate

---

2. Amendments by Act No. 111, 2007 S.C. Acts to this section apply to injuries that occur on or after the effective date of July 1, 2007.

"swift and sure compensation." *Id.* at 441, 581 S.E.2d at 837. The supreme court reversed, citing adherence to the principle articulated in *Wigfall.* "[W]orkers compensation is a creature of statute. As such, we are bound to strictly construe the terms of the statute and to rely on the General Assembly to amend the statute where necessary." *Id.*

The court focused on the plain language of the provision at issue and announced:

> Section 42–15–95 contemplates the disclosure of existing written records and documentary materials. The statute refers to the exchange of "existing information," "medical record[s]," and "X-ray[s]" after receipt of a written request. Moreover, it provides a penalty if the facility or physician fails to "send" information as requested. This language indicates the General Assembly's clear intent to require health care providers and facilities to forward existing written records and documents. The statute does not authorize other "*ex parte*" methods of communication between an insurance carrier, employer, or their representatives and the claimant's health care provider. Of course, insurance carriers and employers may obtain additional information through approved methods of discovery. Likewise, employer representatives may speak with the claimant's health care provider provided they obtain the claimant's permission.

*Id.* at 439–40, 581 S.E.2d at 838. Notwithstanding the appellate court's generally deferential posture regarding an administrative agency's interpretation of an applicable statute, the court held, "where, as here, the plain language of the statute is contrary to the agency's interpretation, the Court will reject the agency's interpretation." *Id.* at 440, 581 S.E.2d at 838.

## 2. Interpretation of "Willful Intention to Kill"

In keeping with the mandate to strictly construe workers' compensation statutes, we must apply the plain and ordinary meaning to words and terms in section 42–9–60, without resorting to subtle or forced construction. The language of section 42–9–60 bars compensation for death that is the result of an individual's willful intention to kill himself. The term "willful intention," as used in the statute, means a deliberate or formed intention. *Zeigler v. S.C. Law Enforce-*

*ment Div.,* 250 S.C. 326, 157 S.E.2d 598 (1967). "The word 'willful' has the same meaning as it has always had under the common law. 'Wilful' means 'intentional.'" *Reeves v. Carolina Foundry & Mach. Works,* 194 S.C. 403, 9 S.E.2d 919 (1940). An act of deliberate intent is not impulsive or instinctive, but rather it is voluntary conduct, so grave and serious as to evidence willful intent. *Zeigler,* 250 S.C. at 331, 157 S.E.2d at 600. But if an employee's conduct is spontaneous, impulsive, instinctive or otherwise lacking a deliberate or formed intention to do injury, it is not the result of willful intention. *Youmans v. Coastal Petroleum Co.,* 333 S.C. 195, 198, 508 S.E.2d 43, 45 (Ct.App.1998) (citing *Kinsey v. Champion Am. Serv. Ctr.,* 268 S.C. 177, 181, 232 S.E.2d 720, 722 (1977)). *See also In re Sponatski,* 220 Mass. 526, 108 N.E. 466, 467 (1915) (describing willful intention in regard to suicide as "a voluntary willful choice determined by a moderately intelligent mental power which knows the purpose and the physical effect of the suicidal act, even though the choice is dominated and ruled by a disordered mind").

*Webster's New Collegiate Dictionary* defines suicide as "the act or an instance of taking one's own life voluntarily and intentionally especially by a person of years of discretion and of sound mind." *Webster,* 1156 (1979). Suicide is "the intentional killing of oneself." *Oxford American Dictionary of Current English,* 813 (1999). *See also Black's Law Dictionary,* 1434 (6th ed. 1992) (defining suicide as "[s]elf destruction; the deliberate termination of one's own life").

 By definition, death from suicide is the result of an individual's willful intention to kill himself. The legislature's intent in drafting this statute is evident from the plain language. The statute is unambiguous, clear on its face, and requires no further construction.

 Fault generally has no bearing upon an employee's right to recover workers' compensation benefits in South Carolina. *See Zeigler,* 250 S.C. at 329, 157 S.E.2d at 599. The only exception to this general principle under our statute is in section 42–9–60. *See Gray v. Club Group, Ltd.,* 339 S.C. 173, 190, 528 S.E.2d 435, 444 (Ct.App.2000). When the legislature carves out a single exception to a general statutory principle, our resolve to strictly construe that exception must

be unequivocal. "[T]he right to benefits is barred where the acts of the employee are such as to come within the legislative exception of willful intent to injure." *Zeigler*, 250 S.C. at 329, 157 S.E.2d at 599.

The Appellate Panel ruled Harvey's death was the result of suicide. Yet, in clear contravention of the literal meaning of section 42–9–60 of the South Carolina Code of Laws, the panel awarded death benefits to Harvey's surviving mother. We hold the Appellate Panel's decision was an error of law and affirm the circuit court's reversal.

## II. Applicable Standard in Claims Involving Suicide.

The determinative factor in this case is the standard by which compensability for suicide is evaluated. The precedent extant reveals a judicial brouhaha of bewilderment and bafflement as to the proper rule in regard to the issue of suicide. The cognoscenti of workers' compensation jurisprudence conceived two expository rules: "willful intent" and "chain of causation." In South Carolina, we reject the "chain of causation" test and adhere to the "willful intent" standard.

### A. Willful Intent Test

Compensability for suicide ultimately turns on the issue of proximate cause versus independent intervening cause. 2 Arthur Larson & Lex Larson, *Larson's Workers' Compensation Law*, § 38.01 (2000). "The basic legal question seems to be agreed upon by almost all authorities: was the act of suicide an intervening cause breaking the chain of causation between the initial injury and the death?" *Id.* If the decedent's death was the result of "willful intent" to take his life, then "willful intent" breaks the chain of causation between the injury and death. Consequently, the decedent's death cannot be said to arise out of the employment. *Id.*

Originally, the "willful intent" test figured predominantly in the majority of jurisdictions deciding workers' compensation cases. *Id.* The Massachusetts court described the test, frequently cited as "*Sponatsky's* [*Sponatski's*] rule," in a 1915 opinion:

> [W]here there follows as the direct result of a physical injury an insanity of such violence as to cause the victim to

take his own life through an uncontrollable impulse or in a delirium of frenzy "without conscious volition to produce death, having knowledge of the physical consequences of the act" then there is a direct and unbroken causal connection between the physical injury and the death. But where the resulting insanity is such as to cause suicide through a voluntary willful choice determined by a moderately intelligent mental power which knows the purposes and the physical effect of the suicidal act, even though choice is dominated and ruled by a disordered mind, then there is a new and independent agency which breaks the chain of causation arising from the injury.

*Larson, supra* at § 38.02(1) (citing *In re Sponatski,* 220 Mass. 526, 108 N.E. 466, 468 (1915)).

Following numerous variations of this formula, courts have generally classified compensable cases based on the distinction between whether the employee's death was the result of conscious volition or delirious impulse. *Id.* Indeed, statutory provisions like South Carolina's section 42–9–60 that exclude intentionally self-inflicted injuries from compensability are often the basis for courts' adherence to "Sponatsky's [Sponatski's] rule." Leslie A. Bradshaw, *Suicide as Compensable Under Workmen's Compensation Act,* 15 A.L.R.3d 616, § 3 (originally published 1967).

The South Carolina Supreme Court espoused the "willful intent" standard for reviewing a death benefits claim in *Mitchem v. Fiske Carter Constr. Co.,* 278 S.C. 180, 293 S.E.2d 701 (1982). While employed with Fiske, Mitchem injured his right knee. He was treated with prescription and over the counter medications. Five months later he was found dead from a drug overdose. *Id.* at 181, 293 S.E.2d 701–02. His wife sought death benefits, claiming Mitchem's knee injury was a direct cause of his suicide. Fiske asserted Mitchem's death was the result of willful intention and not causally related to his employment. *Id.* The supreme court upheld the Appellate Panel's conclusion that willful intention barred the death benefits, indicating that Mitchem's "willful intent" broke the causal relationship between the work accident and his subsequent death. *Id.* at 183, 293 S.E.2d at 703. This holding implicitly rejects the chain of causation test, because the chain of causation linking Mitchem's suicide to his work injury was

apparently undisputed. Nevertheless, the court applied "willful intent" as the test for compensability.

## B. Chain of Causation Test

"The "chain-of-causation rule," succinctly stated, is that where the injury and its consequences directly result in the workman's loss of normal judgment and domination by a disturbance of the mind, causing the suicide, his suicide is compensable." Bradshaw, 15 A.L.R.3d 616, § 5.

> This rule rejects the tort liability concept of fault (which stresses the independent intervening cause), and the criminal-law standard of insanity (which requires that the person not know what he is doing), substituting therefor the "chain-of-causation" or "but for" test and the requirement of an uncontrollable "compulsion" to commit suicide. This latter requirement differs from the uncontrollable "impulse" test, as it has been applied under the Sponatski rule, in that the compulsion need not be abrupt or unpremeditated, but must be the result of an inability to exercise sound discretion.

*Id.*

Under the chain of causation paradigm, an injury may be compensable if the work injury caused the deranged mental condition, which in turn caused suicide. *Larson, supra* at § 38.01. In applying the "chain of causation" test, courts have emphasized, to varying degrees, a required showing of "genuine brain derangement," or "some form of insanity, mental disease, mental derangement, or psychosis," as opposed to mere "brooding or depression," "melancholy, discouragement, or other sane condition." *Id.* at § 38.03

The "willful intent" test has been gradually displaced by the "chain-of causation" test in the majority of jurisdictions. *Id.* at § 38.01.

## C. The North Carolina Standard

North Carolina is among the majority of jurisdictions that have adopted the "chain of causation" test to determine if suicide is compensable. *See* Bradshaw, 15 A.L.R.3d 616. In *Petty v. Associated Transp., Inc.,* 276 N.C. 417, 173 S.E.2d 321 (1970), the Supreme Court of North Carolina reversed the North Carolina Commission's denial of death benefits to Pet-

ty's widow. The Commission held the claim was barred based on section 97–12 of the General Statutes of North Carolina, which provided in pertinent part: "No compensation shall be payable if the injury or death was occasioned by the ... willful intention of the employee to injure or kill himself or another." *Petty,* 173 S.E.2d at 326.

The court framed the issue with the following question: "Does an employee who intentionally takes his own life because of a mental derangement produced by a compensable injury act willfully within the meaning of G.S. [section] 97–12?" *Id.* The North Carolina court embraced the "chain of causation" test and held "an employee who becomes mentally deranged and deprived of normal judgment as the result of a compensable accident and commits suicide in consequence does not act willfully within the meaning of G.S. [section] 97–12." *Id.* at 329. In so doing, the court concluded the "chain of causation" test best effectuated the purpose and intent of the North Carolina Workers' Compensation Act. *Id.*

The *Petty* court rejected the Commission's construction of section 97–12 as incompatible with the Workers' Compensation Act—which was "to provide for the injured workman, or his dependents in the event of his death, at the cost of the industry." *Id.* at 328. To that end the court announced the rule of statutory interpretation in North Carolina: "[B]enefits under the Act 'should not be denied by a technical, narrow, and strict construction.'" *Id.* (citing *Hollman v. City of Raleigh,* 273 N.C. 240, 159 S.E.2d 874, 882 (1968)).

Following *Petty,* the North Carolina Court of Appeals vacated the Commission's denial of benefits in a later workers' compensation case that involved suicide. *Thompson v. Lenoir Transfer Co.,* 48 N.C.App. 47, 268 S.E.2d 534 (1980). Recognizing that *Petty* established "mental derangement may be caused by the consequences of the injury, including pain and despair, as well as by the injury itself," the *Lenoir Transfer* court remanded the case for consideration of evidence that a direct causal connection between the accident and the suicide existed. *Id.* at 539.

 North Carolina court decisions interpreting the state's workers' compensation statute are entitled to weight when South Carolina courts interpret our workers' compensa-

tion law because the South Carolina statute was fashioned after that of North Carolina. *Stephen v. Avins Const. Co.*, 324 S.C. 334, 340, 478 S.E.2d 74, 77 (Ct.App.1996). However, where North Carolina's public policy and equity principles differ materially, South Carolina's legislative and judicial pronouncements must prevail. *Wigfall v. Tideland Utilities, Inc.*, 354 S.C. 100, 114–15, 580 S.E.2d 100, 107 (2003).

> It is essential to remember that the Legislature created a system, for good or ill, which serves a social function by providing the injured employee with sufficient income and medical care to keep him from destitution ... [it is] not designed to compensate the employee for his injury, but merely to provide him with the bare minimum of income and medical care to keep him from being a burden to others....
>
> An important function of legislation is to consider and to balance the competing interests and equities arising from the conduct of human affairs. Worker's compensation laws are a classic example of this legislative balancing of the equities. When the legislature has struck a balance by enacting a statutory rule, the courts have no prerogative to annul the legislative choice by applying "chancellor's foot" notions of equity in its place. Stated differently, it is not the province of this Court to perform legislative functions. The function of equity is to supplement the law, not to displace it.

*Id.* at 116–17, 580 S.E.2d at 108 (internal citations and quotations omitted).

 In *Petty*, the North Carolina Supreme Court enunciated a rule that directly contravenes South Carolina's judicial policy of strictly construing workers' compensation statutes. Our workers' compensation law is a creature of statute, enacted in derogation of the common law, and we are bound to strictly construe its terms. *Brown v. Bi–Lo, Inc.*, 354 S.C. 436, 438–39, 581 S.E.2d 836, 837 (2003). The language in section 42–9–60 bars compensation for death that is the result of a willful intention. "Willful intent" is the standard to be applied in South Carolina in determining whether a self-inflicted injury or death is compensable under section 42–9–60. We, therefore, decline to follow the majority of jurisdictions,

including North Carolina, in embracing the "chain of causation" test.

## III. Evidentiary Analysis

In reversing the Appellate Panel's award of benefits, the circuit court concluded, as a matter of law, that if suicide is compensable at all, it must be the result of a spontaneous or uncontrollable impulse or lapse of rationality, negating Harvey's willful intention. Applying the "willful intent" standard, we review the record for substantial evidence that Harvey's death (1) was not the result of his willful intention, or (2) was a "natural consequence" flowing from his compensable accident.

### A. Negation of Willful Intent

Under section 42–9–60, suicide is a defense to a workers' compensation death claim, for which the party asserting it has the burden of proof. *Zeigler v. S.C. Law Enforcement Division,* 250 S.C. 326, 157 S.E.2d 598 (1967); *see* S.C.Code Ann. § 42–9–80, restated in S.C.Code Ann. § 42–9–60 as amended by Act No. 111, 2007 S.C. Acts ("In the event that any person claims that the provisions of this section are applicable in any case, the burden of proof shall be upon such person.").

"[W]here the testimony on the subject produces a conviction in favor of suicide, that fact shows that the employer has met the burden resting upon him. Only if, after a consideration of all of the testimony, a reasonable inference of suicide cannot be drawn, can it be said that the employer failed to meet the burden." *In re Crawford,* 205 S.C. 72, 72, 30 S.E.2d 841, 847 (1944).

Thompson asserts Cisson failed to prove Harvey's suicide was the result of his "willful intention" to kill himself. Concomitantly, Thompson contends Harvey's work injury aggravated his pre-existing psychiatric condition to the extent he was no longer in control and his death was not a result of willful intention.

Whether an employee acted with willful intent to injure or kill himself is a question of fact for the Appellate Panel to determine. *Youmans v. Coastal Petroleum Co.,* 333 S.C. 195, 199, 508 S.E.2d 43, 45 (Ct.App.1998). The finding

must be predicated on the employee's deliberate or formed intention rather than on spontaneous, impulsive, or instinctive conduct. *Id.* The act must be a product of the employee's conscious volition. *See Zeigler,* 250 S.C. at 331, 157 S.E.2d at 600 (indicating an act of deliberate intent is not impulsive or instinctive, but rather it is voluntary conduct, so grave and serious as to evidence willful intent).

■ Approximately six months prior to his death Harvey's deposition was recorded. He was thirty years old at the time and claimed to have completed middle school. He never obtained his GED and admitted he could read and write very little. Harvey never served in the military or pursued technical training or adult education. He lost his driver's license approximately eleven years prior to his deposition due to a DUI charge but had plans to re-apply after the first of the year. Harvey acknowledged one other arrest when he was fourteen for distributing marijuana.

Harvey testified he had bipolar disorder for most of his life. He was hospitalized twice for suicide attempts following separation from his wife, in the mid 1980s, and from his girlfriend, in the mid 1990s. In 1995, Harvey discontinued medication for his bipolar disorder. He stated, "I was just dealing with it on my own." He alleged he stopped treatment "[b]ecause I couldn't afford the medications." Harvey received no further treatment for his psychiatric condition until seeing Dr. Galvarino in 2001. He claimed he had been "dealing with it all right" without his medication.

Nine months prior to Harvey's suicide, he began living with his mother after separating from his girlfriend. Harvey denied any depression related to the break-up of the relationship and professed "I've been with my mother and everything's been fine." He disavowed any suicide attempts in the last five years, or since January of 2000.

At the time of his deposition Harvey's chief complaint was pain resulting from his work related injury. He had been treated with physical therapy, medication, steroid injections, and a TENS unit. Additionally, he had mobility problems and walked with a cane. Harvey alleged his injury caused "a lot of depression." "You know, once you get hurt and you can't do

certain things, you ain't brining in no money, it causes problems."

Thompson was deposed in June of 2002, three months after Harvey's death. She identified her son's psychiatric condition as depression but knew relatively little about his medical history. She recalled taking him to a mental health clinic the first time he required hospitalization, because "he was real depressed. He had been taking drugs." However, Thompson was unaware of Harvey's second hospitalization and disclaimed any knowledge he had ever attempted suicide. She confirmed he was on quite a few medications when he moved in to live with her, but she could only specify Oxycontin as one of them. Thompson said Harvey kept all his medications in his room, and she did not assist him in managing his medications, except to transport him to fill his prescriptions.

During the nine months Harvey lived with Thompson, she described his mental condition: "He had his days. Some days he was better than others, you know, but I have seen a lot better. [H]e kindly stayed to hisself." When asked if he seemed to get better or worse over the course of his nine-month stay, Thompson answered:

I would say that he was about the same, but he couldn't go—like he couldn't go with me shopping if I actually had to do a lot of shopping because he could not walk that far without a cane. Okay? He tried it one time. He fell in the store, and I had to get him out of the store. And that got on his nerves. He—I don't know what all he was having to take for pain, but now, [Harvey], he's not the type of person that would want to take medicine unless he really had to. And since this [work] accident, he has been in a lot of pain.

Thompson averred Harvey never really discussed his injuries or the details of his workers' compensation claim with her. She simply drove him to his appointments with Dr. Shallcross and Dr. Galvarino. She estimated he saw Dr. Galvarino once a month and Dr. Shallcross about every three months.

Leading up to the day of his death, Thompson did not observe anything different about Harvey, his daily schedule, or a change in his habits. He said nothing to her about any particular problems. On the Saturday before he died, she

indicated "he didn't act like there was anything at all even bothering him."

Thompson was unable to awaken Harvey on the morning of March 4, 2002. He had an appointment with Dr. Galvarino, and she had planned to get him up early to shower. The room was undisturbed; the television was on and Harvey held the remote in his hand. Thompson reported he was in his normal sleeping position. No suicide note was discovered. Thompson professed she believed her son's death was accidental—that he ingested his medication, fell asleep, and took it again when he later awoke, forgetting about the first dose.

In a statement clarifying autopsy findings, Dr. Woodard explained:

> Within the gastric contents far in excess of ten intact Oxycontin pills of a 10 mg. dose were identified. These were mixed with other unidentifiable pill debris. This finding within the gastric contents required a willful decision to swallow a massive number of pills. This number of pills was far in excess of any individual who mildly exceeded their recommended dosage or were elicitly using a controlled substance for recreational purposes.

Dr. Shallcross's records first mention Harvey's emotional condition in January of 2001. On that date, Harvey denied suicidal intent, but admitted he had fleeting thoughts of killing himself. Harvey asked for antidepressant medication at that time. In May 2001, Dr. Shallcross reported Harvey was not receiving treatment for his pre-existing bipolar disorder, but recommended he obtain treatment regardless of his physical status. Dr. Shallcross advised, "it could reasonably be said that with his problems with job disruption due to his work-related injury that being under the care of a psychologist or psychiatrist would be more strongly indicated now than in general." Dr. Shallcross noted he planned to begin tapering off Harvey's Oxycontin and Lortab.

On August 30, 2001, Dr. Shallcross observed Harvey's affect was a bit brighter and commented that he was seeing Dr. Galvarino for his bipolar disorder. The report of his December 6, 2001 visit revealed Harvey was currently using more Oxycontin than he was prescribed. Dr. Shallcross's impressions of his emotional condition were not recorded. Finally,

on February 7, 2002, Dr. Shallcross wrote: "I did not detect any evidence of mania or severe depression in this patient and can make no claim as to whether his current status is based on his pre-existing bipolar disorder or whether this was aggravated by his work condition."

Thompson relies heavily on the testimony of Harvey's psychiatrist in support of her claim that Harvey's psychiatric condition negated his willful intention to kill himself. Harvey began treating with Dr. Galvarino approximately fifteen months after his work injury. Dr. Galvarino characterized Harvey's emotional state as progressively deteriorating. He testified in deposition that Harvey's condition seemed to be irreversible, rendering him totally and permanently disabled. Dr. Galvarino observed that Harvey was at times "overbearing, losing control readily," and at other times "in better control ... speech was coherent and relevant and mood was elated." In one treatment session Dr. Galvarino noted "The new medication is not working. He also has been crying. The patient has been target practicing with a pellet gun. He was very angry, about to explode.... His life is very limited. He's about to lose control."

Dr. Galvarino opined Harvey's compensable work injury was causally linked to his suicide:

> The patient, as I mentioned earlier, did have a longstanding history of depression, anxiety, bipolar disorder and alcohol and drug abuse. The patient was involved in an injury in [January] [3] of 2000. Ever since, the patient has been experiencing depression. Seems to me the depression has worsened. When I saw him the patient was evaluated, given treatment.... Treatment has failed. The patient's illness has progressed to an extent that he could no longer bear it; henceforth, his suicide. It's my opinion that patient's depression was significantly exacerbated by his injury. The patient's suicide was secondary to his depression, was exacerbated to a point that the patient could no longer handle it....

Although Dr. Galvarino's testimony may support a chain of causation between Harvey's work injury and his suicide, chain

---

3. Dr. Galvarino confirmed an error in his notes indicating the work injury occurred in June rather than in January was typographical.

of causation is not the test for compensability of a self-inflicted injury under our statute and judicial precedent. If Harvey's death is to be compensable at all, it must be the result of a spontaneous or uncontrollable impulse, or lapse of conscious volition negating his willful intention. The record before us contains little evidence to support that Harvey's suicide meets that standard.

Substantial evidence unquestionably documents Harvey's injury, pain, and severe psychiatric symptoms. However, evidence in the record tending to negate willful intention is *de minimus*. Dr. Galvarino's medical reports indicate Harvey was at times feeling "out of control" and unable to cope. Yet, at other times Harvey appeared to be managing his illness without extreme distress. Testimony from his mother and notes from Dr. Shallcross reveal nothing to indicate Harvey was not rational or in control of his own volition in the months prior to his death.

Harvey's own deposition testimony appears to reflect a fairly intact thought process. He was able to recount his medical history and the past events leading up to his previous hospitalizations. He acknowledged his suicide attempts resulted from depression over failed relationships. Moreover, Harvey apparently understood the efficacy of medication for his psychiatric symptoms and asked Dr. Shallcross to prescribe an antidepressant when his emotional condition warranted it.

Harvey's two previous suicide attempts inherently suggest deliberative thinking that contemplates one's own demise as a way of coping with depression. Dr. Shallcross mentioned Harvey had fleeting thoughts of killing himself, and Dr. Galvarino's records reflect concern about Harvey's feelings of helplessness, hopelessness, and suicidal ideation. Harvey's admission that he had been target practicing with a pellet gun raises additional concern about his coping strategy.

Neither Dr. Shallcross nor Dr. Galvarino opined Harvey's suicide was the result of a mental process that negated his willful intention. Though Dr. Galvarino reported episodes of severe distress, in the end he asserted that, if Harvey committed suicide, it was intentional, because by definition, suicide is intentional. Finally, Dr. Woodard concluded, to a reasonable

degree of medical certainty, that Harvey's death was the result of a willful massive overdose of medication.

Considering all of the direct and circumstantial evidence, including lay and expert testimony, to conclude Harvey's suicide was not the result of his willful intention would be surmise, conjecture, or speculation. The record fails to support that Harvey was overcome by a spontaneous, impulsive, or instinctive urge, or that he was devoid of deliberate or formed intention.

The chain of causation Dr. Galvarino posited may have established that the aggravation of Harvey's psychiatric condition was compensable. Nevertheless, willful intention was the independent intervening variable that severed the causal relationship between the injury and suicide. Without evidence negating willful intention, the only reasonable inference is that Harvey's suicide was the result of his willful intention.

The Appellate Panel erred as a matter of law in apparently evaluating compensability for Harvey's suicide using the chain of causation test. The appropriate standard in this state is willful intent. Moreover, the decision that Harvey's suicide was compensable is clearly erroneous in view of substantial evidence in the record that Harvey's death was the result of his willful intention.

### B. Natural Consequence of Compensable Injury

■ Thompson maintains Harvey's suicide is compensable because it was a "natural consequence" of his work-related injury. We disagree.

■ "A [mental] condition which is induced by a compensable physical injury is ... causally related to that injury." *Getsinger v. Owens–Corning Fiberglas Corp.*, 335 S.C. 77, 81, 515 S.E.2d 104, 106 (Ct.App.1999) (quoting *Estridge v. Joslyn Clark Controls, Inc.*, 325 S.C. 532, 538–39, 482 S.E.2d 577, 580–81 (Ct.App.1997)).

■ A work-related accident which aggravates or accelerates a pre-existing condition, infirmity, or disease is compensable. *Hargrove v. Titan Textile Co.*, 360 S.C. 276, 599 S.E.2d 604 (Ct.App.2004) (citing *Brown v. R.L. Jordan Oil Co.*, 291 S.C. 272, 353 S.E.2d 280 (1987); *Sturkie v. Ballenger Corp.*, 268 S.C. 536, 235 S.E.2d 120 (1977); *Mullinax v. Winn–Dixie Stores, Inc.*, 318 S.C. 431, 458 S.E.2d 76 (Ct.App.1995)).

■ Aggravation of pre-existing psychiatric problems is compensable if that aggravation is caused by a work-related physical injury. *Anderson v. Baptist Med. Ctr.*, 343 S.C. 487, 493, 541 S.E.2d 526, 528 (2001); *Smith v. NCCI, Inc.*, 369 S.C. 236, 254, 631 S.E.2d 268, 278 (Ct.App.2006).

■ A condition is compensable unless it is due solely to the natural progression of a pre-existing condition. *Mullinax*, 318 S.C. at 437, 458 S.E.2d at 80. It is no defense that the accident, standing alone, would not have caused the claimant's condition, because the employer takes the employee as it finds him or her. *Id.* "[A]ggravation of a pre-existing condition is compensable where disability is continued for a longer time, even though no disability would normally have resulted from the injury alone, or even if the aggravation would have caused no injury to an employee who was not afflicted with the condition." *Id.* (internal quotations omitted).

■ The "natural consequences" flowing from a compensable injury, absent an independent intervening cause, are compensable. *Id.* at 436, 458 S.E.2d at 79. "The causal sequence ... may be more indirect or complex, but as long as the causal connection is in fact present the compensability of the subsequent condition is beyond question." *Id.* at 437, 458 S.E.2d at 80 (quoting Arthur Larson, *The Law of Workmen's Compensation* § 13.11(b) (1994)).

In *Mullinax*, the claimant sustained a work-related injury to her back and sought medical treatment. Subsequently, she developed incontinence she claimed resulted from the injury or from the exercise treatment prescribed for the injury. 318 S.C. at 433, 458 S.E.2d at 78. The employer contended claimant's incontinence was caused by a prior hysterectomy and "not work related nor related to any problem caused by treatment for her work-related injury." *Id.* at 434, 458 S.E.2d at 78. The single commissioner, whose findings were adopted by the Appellate Panel, found no causal relationship between the claimant's incontinence and her work-related injury. Reviewing the record for substantial evidence supporting the Appellate Panel's decision, the court of appeals determined "all of the evidence shows that, the accident or the exercises, a natural consequence of the accident, at a minimum aggravated the incontinence." The court reasoned:

The Commission committed legal error when it based its decision solely on the lack of a medical opinion stating [claimant's] injury caused the incontinence. In doing so, it ignored the medical and circumstantial evidence in the record, which shows either the injury or the treatment for the injury aggravated the incontinence. This is true even though [the claimant] may have suffered some degree of incontinence before the injury, and even though her prior medical history made her condition more susceptible to aggravation by the injury or its treatment. Both circumstantial evidence and lay testimony are competent in worker's compensation cases if the injury and disability can be reasonably connected through their use.

Following the reasoning in *Mullinax,* the argument could be made in the case *sub judice* that Harvey's knee injury caused the chronic pain, a natural consequence of the injury, which aggravated his pre-existing psychiatric condition. However, Thompson extends the causal relationship even further, claiming as a natural consequence of Harvey's aggravated pre-existing psychiatric condition, he committed suicide two years later.

As we held in *Mullinax,* natural consequences flowing from a compensable injury are only compensable absent an independent intervening cause. 318 S.C. at 436, 458 S.E.2d at 79. Yet, suicide, by definition, is an act of willful intention. Suicide is an unnatural consequence of work related depression because it injects the willful intention of the employee into the calculation. The employee's willful intention to kill himself is the independent intervening cause that severs the link with the compensable injury.

Moreover, while suicide resulting from depression is foreseeable, it is not a natural consequence of depression. Conceptually, the notion of natural consequence connotes the inevitability of a result beyond the employee's control.

### CONCLUSION

We rule, as a matter of law, that the plain language of section 42–9–60 bars compensation for Harvey's death resulting from his "wilful intention to kill himself." The test in South Carolina for evaluating compensability is whether the

employee's suicide was the result of "willful intent." Unless substantial evidence supports a finding that "willful intent" is negated by spontaneous, impulsive, or instinctive conduct, without deliberate or formed intention, or without conscious volition to produce death, the statutory bar to workers' compensation benefits applies.

After thorough review of the record, we conclude the evidence fails to establish that Harvey's psychiatric condition negated his willful intent to kill himself. Willful intention, as an independent intervening variable, broke the chain of causation between the work-related injury and suicide. Consequently, Harvey's suicide was not causally related to or a "natural consequence" flowing from his work-related injury.

Accordingly, the order of the circuit court is

**AFFIRMED.**

WILLIAMS, J. and GOOLSBY, A.J., concur.