670 S.E.2d 374

**Ernest Lee PASCHAL, Respondent/Appellant,**

v.

**Richard PRICE, d/b/a RAP Financial Services, Employer, and S.C. Uninsured Employer's Fund, Appellants/Respondents.**

No. 4454.

Court of Appeals of South Carolina.

Submitted June 1, 2008.

Decided Nov. 4, 2008.

Withdrawn, Substituted and Refiled Nov. 24, 2008.

Rehearing Denied Dec. 19, 2008.

Clarke W. McCants, III and Amy Patterson Shumpert, both of Aiken and Stanford Ernest Lacy, of Columbia, for Appellants–Respondents.

Ann McCrowey Mickle, of Rock Hill and Thomas Roy Young, Jr., of Aiken, for Respondent–Appellant.

**AFFIRMED**

THOMAS, J.:

This is a cross-appeal in a workers' compensation case. The single commissioner found the claimant, Respondent–Appellant Ernest Lee Paschal, sustained injuries in an accident that arose out of and in the scope of his employment with Appellant–Respondent Richard A. Price, d/b/a RAP Financial Services (Price) and awarded him compensation at the maximum rate for the year during which the accident occurred, plus lifetime medical benefits for permanent and total disability. These rulings were affirmed by the appellate panel of the South Carolina Workers' Compensation Commission and the circuit court. Appellants–Respondents Price and the S.C.

Uninsured Employer's Fund[1] appeal (1) the determination that Paschal was Price's employee rather than an independent contractor, (2) certain aspects of the benefits awarded, and (3) the denial of a new hearing before a different commissioner because of concerns that remarks by Paschal's attorney may have tainted the proceedings. In his appeal, Paschal alleges Price's appeal to the circuit court was untimely and, therefore, the court erred by allowing it to proceed. We affirm.

## FACTS AND PROCEDURAL HISTORY

In 1987, Price began collection work from his residence. This work led to the formation of RAP Financial Services (RAP), a sole proprietorship specializing in the recovery of collateral, typically automobiles, for banks and other lienholders. In addition to repossessors (known as "drivers"), RAP used clerks, skip tracers, and other office personnel to work with lenders to recover their collateral. Initially, each worker was paid a salary without deductions and received a 1099 form at the end of the year.

In 1996 or 1997, Price organized his drivers into teams. Under the team concept, Price paid all the expenses of a recovery as well as designated rates to each team member.

Paschal first applied to work as a driver with RAP in April 1998, filling out a preprinted form entitled "Application for Employment." The information Paschal provided on the form indicated that he was submitting an application on his own behalf and not as a principal of a business, desired work as a "repo man," and had previously held two similar positions for which he was compensated "per car." RAP accepted Paschal's application and assigned him to a team; however, Paschal worked as a driver for only a few weeks in 1998.

In the latter part of 1998, Price was audited by the Internal Revenue Service. As a result of the audit, RAP was reorganized so that its account representatives, skip tracers, secretaries, and other clerical personnel who worked within its

---

1. The Uninsured Employer's Fund is a party to this action because Price did not have workers' compensation at the time of Paschal's accident. The name "Price" will be used interchangeably to refer to Richard Price, RAP Financial Services, the S.C. Uninsured Employer's Fund, or any combination thereof.

office were compensated as employees and had taxes withheld from their paychecks. The team concept, however, was abandoned, and drivers continued to be compensated as independent contractors.

In January 1999, after Price discontinued the team concept, Paschal again began working as a driver for RAP. According to Price and other witnesses, Paschal also signed an independent contractor agreement; however, Paschal disputed this assertion and neither an original nor a copy of that agreement could be produced. Although Price maintained Paschal signed another independent contractor agreement on January 4, 2000, only a copy of the agreement could be produced at the hearing and Paschal's position was that the duplicate was a forgery.

As they did with other drivers, RAP representatives would fax, call, or personally deliver to Paschal information identifying and locating the vehicles to be repossessed. In addition, RAP instructed Paschal as to the most expedient order in which to take possession of the vehicles that he was responsible for recovering.

Usually, RAP would assign accounts to drivers based on the geographic location of the collateral to be repossessed. Paschal, however, would also handle accounts outside South Carolina and was often referred to as the "clean-up man" because he would repossess cars that other drivers could not find in their respective locations.

Although Paschal initially used his own truck for his work, RAP loaned him money for the purchase of additional trucks for his use in the repossession business. RAP also provided Paschal with a beeper, a toll-free telephone number, a business card, and keys to facilitate access to many of the cars being repossessed. Price also allowed Paschal to use vehicles belonging to RAP when Paschal's truck was not operable. Although Paschal paid for fuel and maintenance, RAP wrote off the depreciation on the vehicles as a business expense. RAP also loaned Paschal interest-free money for the purchase of other equipment such as hydraulic lifts and tow packages, paying the providers directly and subtracting the reimbursement payments from whatever was due Paschal in a given week for the vehicles he had recovered. When Paschal was

working away from his home, RAP provided financial assistance for gas money and lodging. In one instance, Price paid for a bus ticket for Paschal to go to Florida to pick up a car from another repossession facility.

During 2000, the last year he worked as a driver for RAP, Paschal was assigned more than six hundred accounts and worked seven days per week, averaging two repossessions per day. On an average day, RAP would page Paschal eight to ten times to provide instructions and obtain updates from Paschal on recovery efforts, even on vehicles he had already repossessed. At times, Paschal would return home at eight o'clock in the morning after working all night, only to be called an hour later by RAP and told to get up, come to the office, get more accounts, and go to work. Price would also call Paschal's mother's home in Charleston at inappropriate hours looking for Paschal. On one occasion, after Paschal returned home because he ran out of money, Price became angry and instructed Paschal that in the future he was to call RAP to have funds sent through Western Union.

The business card provided to Paschal was designed and paid for by RAP. It identified Paschal as a "field adjuster" and listed "RAP Financial Services" at the top in bold print. Moreover, RAP directed its staff not to mention to debtors that their vehicles were repossessed by independent contractors. RAP required Paschal to give this card to the debtor when repossessing a vehicle or to leave the card at the debtor's residence.

RAP ultimately remained responsible to the lienholders for the recovery of the collateral and made arrangements for its drivers to store vehicles at designated facilities. It also provided Paschal with instructions on how to mark the vehicles for identification and required him to complete a "condition report," which RAP provided, describing wear and tear on the collateral as well as an inventory of the personal items in the car for RAP to give to the debtor.

On October 25, 2000, Paschal was severely injured when the repossessed vehicle that he was towing blew a right rear tire and began to swerve. Paschal lost control of his own vehicle, which turned sideways, swerved left into the median, and overturned. Paschal was not wearing a seatbelt and was

thrown from his vehicle, which landed on him and crushed his spinal cord, paralyzing him from the waist down.

On November 15, 2000, less than a month after Paschal's accident, Price applied for a workers' compensation policy with Joe B. Babb & Co., Inc. In his application, Price indicated he did not use subcontractors.

After the accident, Paschal met with a vocational rehabilitation counselor who, with Paschal's input, set up a plan for his rehabilitation. Paschal, however, did not follow through with the plan. In July 2001, Paschal worked as a skip tracer for RAP, but that employment lasted only a few weeks. On April 4, 2002, during a deposition in a lawsuit unrelated to the present litigation, Paschal acknowledged he did not bring a workers' compensation claim for his injury and stated he was self-employed at the time of the accident.

On June 5, 2002, Paschal commenced this action by filing a Form 50 with the South Carolina Workers' Compensation Commission. Price filed a Form 51 admitting Paschal was injured in an automobile accident, but denying he was an employee.

The matter came before the single commissioner in December 2003 for three days and in January 2004 for one day. On February 17, 2005, the single commissioner issued an order in which he found Paschal was an employee of RAP, had become totally disabled from the accident, and was entitled to the maximum rate of compensation. Price appealed to the appellate panel of the South Carolina Workers' Compensation Commission.

On February 1, 2006, the appellate panel issued an order affirming the single commissioner's findings. On Thursday, March 2, 2006, Price mailed his notice of appeal to Paschal and the Clerk of Court for Aiken County (Clerk). Although the notice, along with the filing fee, was timely received on March 3, the Clerk did not clock it in because a civil cover sheet was not attached as required by an administrative order issued by the South Carolina Supreme Court. On or about March 8, the Clerk returned the notice of appeal to Price by mail with a form letter indicating a cover sheet was needed. Price again submitted the notice of appeal with the cover sheet the same day. The Clerk clocked in the notice of appeal on March 10,

2006, and assigned a case number to the matter. Price did not send Paschal another copy of the notice of appeal with the accompanying cover sheet.

On May 10, 2006, Paschal moved to dismiss Price's appeal as untimely. The following day, Price moved for a *nunc pro tunc* order designating the filing of the notice of appeal as March 2, 2006. The motion to dismiss came before the circuit court on May 31, 2006. At the hearing, counsel presented arguments on both Paschal's motion to dismiss and Price's appeal of the appellate panel's order.

On October 17, 2006, the circuit court issued an order affirming the decision of the appellate panel. Price filed a notice of appeal with this Court on November 15, 2006. Thereafter, on November 27, 2006, the circuit court issued an order denying Paschal's motion to dismiss. The court later denied a motion [2] by Paschal to alter or amend the denial of his motion to dismiss, and Paschal filed his notice of cross-appeal with this Court on February 23, 2007.

## LAW/ANALYSIS

### I. Appeal of Price and S.C. Uninsured Employer's Fund

### A. Paschal's Status as an Employee

■ RAP first takes issue with the finding that Paschal was its employee rather than an independent contractor, arguing the facts of this case favor a contrary determination. We, however, hold RAP has not carried its burden to show the finding that Paschal was an employee was against the weight of the evidence.

■ In workers' compensation law, the existence of an employer-employee relationship is a jurisdictional question. *Nelson v. Yellow Cab Co.*, 349 S.C. 589, 594, 564 S.E.2d 110, 112 (2002). If the factual issue before the commission involves a jurisdictional question, review by the appellate court is governed by the preponderance of the evidence standard. *Id.*

---

2. The motion to reconsider and to alter and/or amend judgment does not address the circuit court's ability to issue a *nunc pro tunc* order in this situation. Indeed, this Court is unable to find any signed *nunc pro tunc* order from the circuit court in the Record on Appeal.

Accordingly, the appellate court has the power to decide the issue of jurisdiction based on its own view of the preponderance of the evidence. *Kirksey v. Assurance Tire Co.*, 314 S.C. 43, 45, 443 S.E.2d 803, 804 (1994). Nevertheless, "[w]hile the appellate court may take its own view of the preponderance of evidence on the existence of an employer-employee relationship, the final determination of witness credibility is usually reserved to the Appellate Panel." *Hernandez–Zuniga v. Tickle*, 374 S.C. 235, 243–44, 647 S.E.2d 691, 695 (Ct.App. 2007). Furthermore, the appellant has the burden to show the circuit court's finding regarding jurisdiction is against the preponderance of the evidence. *Gray v. Club Group, Ltd.*, 339 S.C. 173, 182, 528 S.E.2d 435, 440 (Ct.App.2000).

The determination of whether a claimant qualifies as an employee for workers' compensation purposes is "a fact-specific determination reached by applying certain general principles." *S.C. Workers' Comp. Comm'n v. Ray Covington Realtors, Inc.*, 318 S.C. 546, 547, 459 S.E.2d 302, 303 (1995). Among these principles is "South Carolina's policy to resolve jurisdictional doubts in favor of the inclusion of employers and employees under the Workers' Compensation Act." *Dawkins v. Jordan*, 341 S.C. 434, 439, 534 S.E.2d 700, 703 (2000) (citing *Spivey v. D.G. Constr. Co.*, 321 S.C. 19, 21, 467 S.E.2d 117, 119 (Ct.App.1996)).

In determining whether a claimant qualifies as an employee for the purpose of eligibility for workers' compensation benefits, "[t]he general test applied is that of control by the employer." *Young v. Warr*, 252 S.C. 179, 189, 165 S.E.2d 797, 802 (1969). "It is not the actual control then exercised, but whether there exists the right and authority to control and direct the particular work or undertaking, as to the manner or means of its accomplishment." *Id.* (*cited in Nelson*, 349 S.C. at 594, 564 S.E.2d at 113). In determining whether an alleged employer's right of control is such that a claimant is an employee rather than an independent contractor, courts have looked to four factors: "(1) direct evidence of right to or exercise of control, (2) method of payment, (3) furnishing of equipment and (4) right to fire." *Tharpe v. G.E. Moore Co.*, 254 S.C. 196, 200, 174 S.E.2d 397, 399 (1970). As to the

relative weight to be accorded these factors, the supreme court, quoting a leading treatise has stated as follows:

> [F]or the most part, any single factor is not merely indicative of, but, in practice, virtually proof of, the employment relation; while, in the opposite direction, contrary evidence is as to any one factor at best only mildly persuasive evidence of contractorship, and sometimes is of almost no such force at all.

*Dawkins*, 341 S.C. at 439, 534 S.E.2d at 703 (quoting 3 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law*, § 61.04 (2000)).

### 1. Right of Control

Regarding the right of control, we agree with Price that the actual exercise of control by a principal does not create an employment relationship. Still, direct evidence of the exercise of control is recognized as one of the factors to which courts have looked to determine whether a claimant is an employee or an independent contractor. *Tharpe*, 254 S.C. at 200, 174 S.E.2d at 399; *see also* 3 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law*, § 61.05[3] (noting that there is often "no written or tangible document indicating the degree of control reserved" and that "[e]vidence of actual control exercised by the employer and submitted to by the employee becomes, in such cases, the best indication of what the parties understand the employer's right of control to be").

In affirming the finding of the appellate panel and single commissioner that Paschal was an employee of RAP, the circuit court noted the following as evidence of RAP's right to control the manner in which Paschal performed his duties: (1) RAP provided comprehensive information to Paschal regarding the location of the vehicles he was to repossess; (2) RAP determined the most expedient order in which to repossess cars; (3) RAP provided Paschal and other drivers with beepers and toll-free numbers in order to maintain contact with them; (4) RAP provided keys to its drivers so that they could gain entry to the vehicles they were attempting to repossess; (5) RAP required Paschal to complete certain forms with updated recovery information that RAP would provide to its clients; (6) Price paged Paschal as often as ten times per day,

often at odd hours, to provide instructions and obtain current information on recovery efforts and would become upset when Paschal did not answer a page; (7) RAP sent money to Paschal while he was working away from his home "in order to keep him working"; (8) RAP paid for and designed a business card for Paschal to leave with debtors that identified Paschal as a "field adjuster" with the title "RAP Financial Services" listed at the top along with RAP's telephone numbers; (9) RAP gave its drivers specific instructions for completing appraisals and inventory reports, taking the recovered property to designated locations, and marking repossessed vehicles for identification; (10) Price made all the decisions and financial arrangements for the repossessed collateral; and (11) RAP, not its drivers, remained responsible for returning repossessed vehicles to the respective lienholders.

Although Price has taken issue with the implication of these findings, he has not challenged the findings themselves. Admittedly, some of these findings are more appropriately viewed as control necessary to obtain an appropriate end result. Nonetheless, several of the findings support the conclusion reached by the prior tribunals hearing this matter that the control exerted by Price and RAP over Paschal exceeded what was necessary to ensure the recovery of delinquent collateral.[3] Moreover, we cannot ignore Paschal's informal designation as the "clean-up" man, which made his position different from that of other drivers in that he had to be available for assignments away from home at RAP's behest; thus, the frequent calls from Price and the provision of money to Paschal while he was working away from his home were more for the purpose of ensuring his availability for such assignments rather than enabling him to complete the assignments themselves.

---

3. We note the "Independent Contractor Agreement" that Paschal denied signing requires only that the contractor "utilize its best efforts" in recovering property and does not have any terms mandating quotas or deadlines for taking possession of delinquent collateral or requiring the driver be available at the behest of RAP for assignments; therefore, the agreement, even if valid, does not necessarily lend itself to supporting a finding that RAP's efforts in furtherance of productivity goals were measures to achieve a desired end result.

## 2. Furnishing of Equipment

Price asserts error in the circuit court's finding that "RAP provided the vast majority of the equipment used by Paschal in the repossession of collateral," contending that he provided assistance in this regard either because of his generous nature or with the understanding that Paschal would reimburse him. We do not dispute that a number of the items that the circuit court listed as having been provided by RAP to Paschal for his work were either gifts from Price or obtained by Paschal with interest-free loans from Price; however, we also note RAP provided a number of other items of equipment to Paschal at its own expense that did not result from Price's largesse. These included a beeper, a toll-free telephone number, and transportation expenses. Moreover, consistent with the recognized principle that doubts regarding workers' compensation coverage are to be resolved in favor of inclusion, we hold Paschal's provision of his own equipment does not override the control exerted by RAP over the details of his work. *See Larson*, § 61.07[1] (noting the claimant's furnishing of equipment may, if accompanied by other factors, indicate independent contractor status, "but in itself it is not necessarily fatal to a showing of employment based on other grounds").

## 3. Method of Payment

We agree with the circuit court that RAP's provision of a 1099 form rather than a W–2 form is not necessarily determinative of whether Paschal was an employee or an independent contractor at the time of his accident. *See Nelson*, 349 S.C. at 599, 564 S.E.2d at 115 (noting that the method of payment weighed in favor of the alleged employer but declining to view this factor as dispositive of whether the claimant was an employee). In keeping with our standard of review, we also decline to disturb the commission's finding that RAP set non-negotiable fees that drivers would receive for repossessions. Furthermore, consistent with *Nelson*, we note that, although the method of payment in this case may suggest Paschal was an independent contractor rather than an employee of RAP, the testimony of Paschal and others that Price determined the fee drivers would receive for a repossession suggests some degree of control on Price's part. *See id.* ("Although [the method of payment] weighs in favor [of] Yellow Cab, it had **some** degree of control over payment inasmuch as it dictated

the amounts Nelson could charge fares ....") (emphasis in original).

## 4. Right to Fire

As required by our standard of review, we accept as valid the concerns expressed by the single commissioner and affirmed by the appellate panel and the circuit court about the authenticity of a written document that Price claimed Paschal had signed and purportedly contained the terms of an independent contractor agreement between Paschal and RAP. Furthermore, Paschal's testimony that, on one occasion when he was reluctant to repossess a vehicle, Price "[t]old me that I worked for him and that if I did it again I would be terminated" is evidence that Price himself viewed the parties' relationship as one between employer and employee. Finally, although Price argued on appeal that "it is apparent the relationship between Claimant and Price could not be ended until Claimant delivered all vehicles he repossessed and Price paid Claimant for those services," he cited no evidentiary support for this assertion other than the independent contractor agreement that was discredited by the workers' compensation commission.[4]

## B. Paschal's entitlement to lifetime benefits

RAP challenges the finding that Paschal was entitled to lifetime benefits, arguing Paschal failed to carry his burden to show his paraplegia resulted in permanent and total disability. We disagree.

Under section 42–9–10(A) of the South Carolina Code (Supp.2007), an employee who suffers total disability from a job-related injury is entitled to certain specified benefits for a period not exceeding five hundred weeks. The limitation of the period to five hundred weeks is waived, however, for "any person determined to be totally and permanently disabled who as a result of a compensable injury is a paraplegic, a quadriplegic, or who has suffered physical brain damage." *Id.* § 42–

---

4. Moreover, although the purported agreement required "independent contractors" such as Paschal to supply proof of both garage liability insurance and their own workers' compensation insurance, Paschal never obtained either form of insurance and RAP never asked for proof of coverage. We therefore agree with Paschal that the agreement, even if authentic, did not reflect the true relationship between the parties.

9–10(C). By statute, such a claimant "shall receive benefits for life." *Id.* As the supreme court has noted, the legislature has categorized these injuries as "*per se* disabling" such that "the claimant need not show a loss of earning capacity." *Wigfall v. Tideland Utils.,* 354 S.C. 100, 105, 580 S.E.2d 100, 102 (2003). Here, it was undisputed that Paschal became a paraplegic as a result of a work-related injury; therefore, he did not have to show a loss of earning capacity because he was "presumptively totally disabled." *Id.*

## C. Credibility Findings of Paschal and Price

■■■ RAP argues the circuit court erred in upholding the single commissioner's finding that Paschal was a more credible witness than was Price. It was largely in reliance on this finding that the single commissioner determined the allegation that Paschal had signed an independent contractor agreement, a copy of which was admitted into evidence, was false. We find no error.

In support of this argument, RAP contends the single commissioner, in assessing credibility, failed to give adequate consideration to documents in evidence, eyewitness testimony refuting several of Paschal's statements, and an admission by Paschal in a deposition that he considered himself to be self-employed when he was working as a driver for RAP. In our view, however, these are not sufficient reasons for this Court to deviate from the general rule that "[w]hile the appellate court may take its own view of the preponderance of evidence on the existence of an employer-employee relationship, the final determination of witness credibility is usually reserved to the Appellate Panel." *Hernandez–Zuniga,* 374 S.C. at 243–44, 647 S.E.2d at 695. The reliability of the documents and witness statements themselves were matters of credibility for the appellate panel, which, in upholding the single commissioner's order, discounted the credibility of a number of witnesses testifying on behalf of RAP for various reasons, including their demeanor on the stand, biases, obvious fallacies in their statements,[5] and their failure to provide adequate documentation for their statements.

---

5. For example, as the single commissioner noted, one witness for RAP "adamantly refused to admit that repossession of a car was an important part of RAP's business."

As to Paschal's statement during a deposition in a separate lawsuit that he had not yet filed a workers' compensation claim for his injuries because he was "self-employed," the single commissioner found that, at the time of the deposition, Paschal did not understand the difference between an employee and an independent contractor and referred to himself as both during that deposition. The single commissioner also noted that, in any event, what the parties called their relationship would not be dispositive of what that relationship was. RAP has not given us any basis to reject the reasons cited by the single commissioner, who was affirmed by both the appellate panel and the circuit court, for discounting Paschal's purported admission that he was an independent contractor rather than an employee.

### D. Request for Criminal Prosecution

RAP further maintains the circuit court erred in upholding the single commissioner's decision not to grant a new hearing before a different commissioner after counsel for Paschal allegedly tainted the proceedings by requesting the single commissioner to refer Price to the South Carolina Attorney General for criminal prosecution. RAP argues the request gave Paschal a collateral advantage and was a deliberate, calculated, and planned effort to intimidate Price's testimony and to deter him from asserting a vigorous defense.[6] We find no reversible error.

Both the single commissioner and the circuit court noted the untimeliness of RAP's motion for a new hearing as a reason for denying it,[7] and RAP has not challenged this ground in its appellant's brief. Absent such a challenge, there is no reason for us to consider whether RAP was entitled to a new hearing based on its allegations that it was intimidated by the threats of criminal prosecution. *See Anderson v. Short,*

---

6. In her opening statement, counsel for Paschal advised the request for the referral for criminal prosecution resulted from concerns that Price had altered documents in the case.

7. When Paschal's attorney made the request for criminal prosecution, counsel for RAP expressed his opposition, characterizing the request as a threat to scare Price into settling the case; however, he did not move at that time to have the matter heard by another commissioner.

323 S.C. 522, 525, 476 S.E.2d 475, 477 (1996) (affirming the trial court's decision because the appellant appealed only one of the two independent grounds supporting it).

### E. Admissibility of Life Care Plan

■ RAP next takes issue with the admission into evidence of a life care plan prepared by Paschal's expert, arguing the plan was speculative and irrelevant in a workers' compensation case because benefits are set by statute. Because, however, we have already determined that Paschal is entitled to lifetime medical benefits as a matter of law, we hold any error in the admission or consideration of the life care plan is harmless.

### F. Admission of IRS Agent's Testimony

■ RAP also alleges error in admitting testimony from a retired IRS agent regarding the factors used by the IRS to determine whether someone is an employee or an independent contractor, complaining the admission of such testimony allowed the record to be tainted with IRS standards. From our reading of the orders of the three tribunals that have reviewed this matter, however, it is our view that the determination that Paschal was an employee of RAP was based on South Carolina workers' compensation law and was in no way influenced by the IRS criteria. Assuming without deciding that the admission of the disputed testimony was error, we hold it did not prejudice RAP.

### G. Reliance on *Sellers v. Pinedale Residential Center*

RAP also attempts to distinguish *Sellers v. Pinedale Residential Center,* 350 S.C. 183, 564 S.E.2d 694 (Ct.App.2002), and contends the circuit court erred in relying on this case in determining whether the compensation rate set for Paschal was not excessive. We reject this argument.

The employee in *Sellers* was a teenager who had worked three part-time summer jobs and was rendered a paraplegic in a single-car accident. Noting the claimant had aspired to become a master electrician like his father and uncles, had a demonstrated work ethic, and had already made significant progress toward his career goal, this Court applied the "excep-

tional reasons" rule to provide for progressively higher wages based on probable future earnings.[8] RAP argues that, in contrast to the employee in *Sellers*, Paschal was an adult who had already selected his trade and was a less deserving claimant in terms of his character.

Although the single commissioner and the circuit court cited *Sellers* in their orders, the compensation rate for which Paschal was deemed eligible was based on 2000 data of his earnings and expenses rather than on his anticipated future earning capacity. As such, we hold that, even if reference to *Sellers* in any of the prior orders in this case was incorrect, the error was harmless.

### H. Reliance on Form 20

Finally, RAP contends the circuit court erred in upholding the single commissioner's reliance on an erroneous Form 20 that was formally withdrawn four months before the hearing. According to RAP, the Form 20 was erroneously based on Paschal's gross earnings rather than his net earnings, that is, his gross earnings less his expenses. We reject this argument.

The single commissioner found Paschal's compensation rate was $507.34, the same amount indicated on the disputed Form 20. In making this finding, the single commissioner found that "this result, regardless of the method that is used, most accurately reflects Paschal's earnings and is fair to both Price and Paschal." The circuit court, in affirming this finding, further noted "Pachal's average weekly wage and compensation rate was [sic] supported by many other documents in the record," and Paschal, in his respondent's brief, went to great lengths to provide supporting figures for this finding.[9] Con-

---

8. The exceptional reasons rule in *Sellers* is based on section 42–1–40, which provides in pertinent part as follows:

   When for exceptional reasons the foregoing [definition of "average weekly wages"] would be unfair, either to the employer or employee, such other method of computing average weekly wages may be resorted to as will most nearly approximate the amount which the injured employee would be earning were it not for the injury.
   S.C.Code Ann. § 42–1–40 (1985 and Supp.2007).

9. In fact, Paschal submitted that, using his figures, his weekly compensation rate would be $515.70, which exceeds the rate he was awarded.

sidering that Price has not, in either his appellant's brief or his reply brief, challenged the evidence cited to support the weekly compensation awarded to Paschal, we fail to see how the Form 20, even if inaccurate, was prejudicial to RAP.

## II. Cross–Appeal

As we have noted earlier, although Price's notice of appeal was timely received by the circuit court, the clerk of court returned it without clocking it in because it lacked an accompanying civil cover sheet. When counsel returned the notice with the cover sheet, it was clocked in after the filing deadline. Paschal filed a cross-appeal with this Court, arguing the circuit court should have dismissed Price's appeal as untimely. Specifically, Paschal argues the circuit court erred by finding the civil cover sheet was not required to file an appeal from the workers' compensation commission. We disagree.

On March 19, 2004, the South Carolina Supreme Court issued an order (Order) approving the use of Civil Cover Sheet, SCCA/234 (3/2004), (Cover Sheet) in the circuit courts of the state. The Order stated in pertinent part:

> For the purposes of administration, the attached form will be mandatory effective July 1, 2004, and required with all initial pleadings filed in the court of Common Pleas. Prior to the effective date of July 1, 2004, the civil coversheet is optional and not required in counties where Alternative Dispute Resolution is not mandated. This coversheet should be completed, in its entirety, by the attorney filing the action and served on the defendant with the Summons and Complaint. This coversheet shall remain as an attachment in order to document the nature of the action that is being filed and as proof of payment of the filing fee.

The Cover Sheet itself notes,

> The cover sheet and information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is required for the use of the Clerk of Court for the purpose of docketing. It must be filled out completely, signed, and dated. A copy of this cover sheet must be served on the defendant(s) along with the Summons and Complaint.

Aside from providing spaces for the caption, case number, and contact information for counsel, the Cover Sheet provides checkboxes to indicate "Nature of Action" and "Docketing Information," such as whether a jury trial is demanded. In the "Nature of Action" section, under the "Appeals" subheading, is a "Worker's Comp" checkbox.

Section 1–23–380 of the South Carolina Code (2005) sets forth the filing requirements for appeals of administrative decisions under the South Carolina Administrative Procedures Act prior to July 1, 2006.[10] Nowhere in that section or in section 42–17–60, which addresses procedures for appealing a workers' compensation award, is there any mention that a cover sheet is necessary when filing an appeal. In keeping with the supreme court's recent decision in *Skinner v. Westinghouse Electric Corp.,* we decline to hold that a cover sheet, which is not required by statute, is essential to invoke the appellate jurisdiction of the circuit court. *See Skinner v. Westinghouse Elec. Corp.,* 668 S.E.2d 795, 797 (S.C.2008) ("Our jurisprudence confirms that jurisdictional appealability issues are governed by statute, and not by the rules of civil procedure.").

In their briefs, the parties request this Court to find different purposes for the Cover Sheet. In deciding this question, we find the rules of statutory interpretation instructive. When interpreting a statute, all of the language must be read in a sense that harmonizes with its subject matter. *Thompson ex rel. Harvey v. Cisson Constr. Co.,* 377 S.C. 137, 157, 659 S.E.2d 171, 181 (Ct.App.2008). Here, the Order clearly states the Cover Sheet is required "for the purposes of administration." The Order refers to "initial pleadings" and states the Cover Sheet should be served with the Summons and Complaint, the initial pleadings in an action. The notion that the Cover Sheet is for administrative purposes only is further supported by language in the Order that the Cover Sheet is to be used "to document the nature of the action" and "as proof of payment of the filing fee." The Cover Sheet itself declares that it does not "supplement[ ] the filing and service of pleadings or other papers." In light of this language, it is

---

10. This statute was amended in 2006 to provide for review to an administrative law judge and appeal to this Court. 2006 S.C. Acts 387.

our view that the Cover Sheet is at most a ministerial requirement.

In addition, the notice of appeal received by the Clerk on March 3, 2006, satisfied the applicable requirements of the South Carolina Administrative Procedures Act, the South Carolina Workers' Compensation Act, and the South Carolina Appellate Court Rules. Both this Court and the supreme court have held clerical errors in the notice of appeal do not destroy an appeal. *See State v. Scott,* 351 S.C. 584, 587, 571 S.E.2d 700, 701 (2002) (acknowledging that service of the notice of appeal is a jurisdictional requirement, but stating "non-prejudicial clerical errors in the notice are not detrimental to the appeal"); *Weatherford v. Price,* 340 S.C. 572, 577–78, 532 S.E.2d 310, 313 (Ct.App.2000) (holding the incorrect reference in the notice of appeal to the motion for reconsideration rather than the final order did not deprive this Court of jurisdiction to hear the appeal and noting the appellant did attach a copy of the appealed order to the notice); *Charleston Lumber Co. v. Miller Hous. Corp.,* 318 S.C. 471, 478, 458 S.E.2d 431, 435 (Ct.App.1995) ("Clerical errors in a notice of appeal do not destroy the appeal."). We see no reason not to apply these holdings to the present dispute.

Paschal further argues the circuit court erred by failing to find it was deprived of appellate jurisdiction after the Clerk of Court delayed filing Price's notice of appeal until after the thirty-day time limit [11] because it did not include a Cover Sheet. We disagree.

We are mindful of the fact that "[t]he acts of a court with respect to a matter as to which it has no jurisdiction are void." *State v. Guthrie,* 352 S.C. 103, 107, 572 S.E.2d

---

11. The thirty-day time limit was set forth in section 1–23–380, which, at the time Price appealed to the circuit court, provided in pertinent part as follows:

"A party who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision in a contested case is entitled to judicial review under this article, Article 1, and Article 5 .... Proceedings for review are instituted by filing a petition in the circuit court within thirty days after the final decision of the agency or, if a rehearing is requested, within thirty days after the decision thereon."

S.C.Code Ann. § 1–23–380 (2005).

309, 312 (Ct.App.2002). Here, we are not faced with an issue of subject matter jurisdiction but one of appellate jurisdiction. Quite simply, the procedural or administrative rule as to the cover sheet does not act to deprive the court of subject matter jurisdiction. *See Skinner,* at 797("Failure of a party to comply with the procedural requirements for perfecting an appeal may deprive the court of appellate jurisdiction over the case, but does not affect the court's subject matter jurisdiction.") (citations omitted).

Paschal was timely and properly served when Price sent the notice of appeal on March 2, 2006; therefore, Paschal had notice of Price's appeal. Paschal does not allege any prejudice from the omission of a Cover Sheet from the notice, nor does he assert that he was unaware of Price's appeal because of it. We therefore reject Paschal's effort "to take advantage of mere clerical error by which [he] was in no way prejudiced or misled." *Charleston Lumber,* 318 S.C. at 478, 458 S.E.2d at 436; *see also Parissi v. Telechron, Inc.,* 349 U.S. 46, 47, 75 S.Ct. 577, 99 L.Ed. 867 (1955) (holding the inadvertent failure of the appellant to include the required filing fee did not vitiate the validity of the otherwise timely filed notice of appeal); *Scott,* 351 S.C. at 587–88, 571 S.E.2d at 702 (wherein the supreme court held it was "not deprived of subject matter jurisdiction" because of the citation of the incorrect county from which the appeal was taken); *Weatherford,* 340 S.C. at 578, 532 S.E.2d at 313 (holding that "[t]hough [the appellant] did not 'technically' appeal from the trial court's original order by referring to it in the Notice of Appeal," this failure did not warrant dismissal of the appeal because the omission was "of a clerical nature only"); *Miles v. Miles,* 303 S.C. 33, 36, 397 S.E.2d 790, 792 (Ct.App.1990) ("This Court has long recognized an overriding rule which says 'whatever doesn't make any difference, doesn't matter.' ") (citation omitted).

In the present case, the Clerk declined to clock and file the notice of appeal for reasons that did not affect the substance of the appeal or the notice given to Paschal. We recognize that courts of this State have refused to elevate form over substance and accordingly affirm the circuit court's denial of Paschal's motion to dismiss. *See Matter of Ferguson,* 313 S.C. 120, 124, 437 S.E.2d 72, 75 (1993) (holding in a judicial misconduct matter that the mere fact that the respondent was

no longer a judge at the time of the proceedings were initiated against him was irrelevant); *Gordon v. Busbee,* 367 S.C. 116, 119–21, 623 S.E.2d 857, 859–60 (Ct.App.2005) (holding the statutory requirement that a written statement must be "in the form prescribed by rule" "refers to the manner or 'procedure as determined or governed by regulation,' not to a specific 'document with blanks for the insertion of . . . information' ") (citation omitted).

## CONCLUSION

As to Paschal's cross-appeal, we uphold the circuit court's refusal to dismiss Price's appeal as untimely. As to the merits of Price's appeal, we affirm the denial of Price's request for a new hearing before a different hearing commissioner as well as the findings that Paschal was an employee of RAP at the time of his injury and was entitled to lifetime benefits at the maximum rate of compensation.

**AFFIRMED.**

PIEPER, J., and GOOLSBY, A.J., concur.